WESTINGHOUSE ELECTRIC MFG. CO. v. NEW ENGLAND GRANITE
CO. et al.

(Circuit Court of Appeals, Second Circuit.   August 22, 1901.)

No. 140.

PATENTS—VALIDITY AND INFRINGEMENT—ELECTRO-MAGNETIC MOTORS.

The Tesla patents, No. 381,968 and No. 382,279, each for electro-magnetic motors, and No. 382,280, for a method of electrical transmission of power, and all relating to the transmission of electrical power by alternating currents, and its utilization at distant points, were not anticipated by anything in the prior art, and are valid.   Also *held* infringed.

Appeal from the Circuit Court of the United States for the District of Connecticut.

The complainant brought a bill in equity in the circuit court for the district of Connecticut against the New England Granite Company, a Connecticut corporation, and James G. Batterson, a citizen of Connecticut, which was based on the alleged infringement of three patents granted on May 1, 1888, to Nikola Tesla, and numbered, respectively, 381,968, 382,279, and 382,280. Each of the first two patents is for an electric magnetic motor. The third patent is for a method of effecting the transmission of power by electrical agency. The apparatus by which the system is put into practice is described in 381,968. Patent 382,279 describes a specific and different construction of motor. The bill was dismissed as to the defendant Batterson. The interlocutory decree directed an injunction against the granite company upon all the claims which were in issue, viz. claims 1 and 3 of No. 381,968, the single claim of 382,280, and the three claims of 382,279. 103 Fed. 951. From this decree the granite company appealed.

C. E. Mitchell and H. B. Brownell, for appellant.

F. H. Betts and Thomas B. Kerr, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge.   Each patent relates to the method by which electrical power is transmitted by alternating currents to a distant point, and there safely and efficiently utilized, which was invented by Tesla in 1888; but the patents for the method and for the apparatus are for distinct inventions.   The electrical laws under which the force which is called electricity is sent from generator to motor, and is thereafter made useful, are not simple in their character, have compelled the close study of scientists, and cannot be adequately explained with brevity.   An explanation of so much of the subject as is demanded by the patents was given by Judge Townsend in his opinion in this case with clearness, succinctness, and, we believe, accuracy, and is as follows:

"The electric current induced by a mechanical generator—a dynamo—is necessarily alternating in character; that is, alternating in direction, so that the current, acting on an armature, first tends to actuate it in one direction and then reverses said effect, and neutralizes such actuation.   Such a current flows uninterruptedly and regularly, but rises in intensity from zero to maximum, and falls from maximum to zero, and then repeats said variations in the opposite direction.   Its curve of increase or decrease of strength is indicated by a wave line or sine curve.   Every mechanically generated current is naturally and originally an alternating current.   Formerly it was not considered practicable to use mechanically generated currents until their alternations were straightened out by means of commutators which reversed

the direction of the current so as to make it flow continually through the conductors. A current which is periodically reversed by a commutator, which thus breaks the current between the changes in direction and takes off the current in sections, is known as a reversed or alternated current. This distinction between an alternating and an alternated current should be carefully noted. An alternating current continues to act in opposite directions as originally generated. An alternated current has been so reversed that the whole flows in one direction, and is then known as a continuous current. When so reversed by commutators as to become continuous, the current loses certain characteristics essential to its highest efficiency. Prior to the Tesla inventions, only reversed or alternated electric currents were used for the transmission of power. The application of this system for the transmission of power was limited, for various reasons; among others, because a large current could not be safely used at sufficiently high pressure for long distances. On the other hand, the pure alternating current was practically unlimited in volume and pressure, and a change of pressure could be economically effected by the use of a transformer. Prior to Tesla's inventions, however, these rapid alternations of the alternating current prevented the motor from starting its revolution, and interfered with its continuing in operation, except when in synchronism with the generator. It was therefore impracticable for varying loads. The problem which was presented to Nikola Tesla, and which he successfully solved, was, how to overcome the difficulties attendant upon the use of the alternating currents so that their inherent vitality and untrammeled energy might be utilized for the unlimited transmission of power. In an electric motor the tendency of the armature is always towards the pole or point of maximum magnetic intensity. If a loosely-pivoted or freely-moving magnetic bar or armature be suspended midway between two coils of insulated wire wound in opposite directions on a soft iron bar, and one of the coils is electrically energized, north and south poles will be formed at the ends of the soft iron bar, their location depending upon which coil is energized; but, if both coils be equally energized, the two poles will neutralize each other, and cause a resultant north pole midway between the coils. If, now, the current in one coil be made weaker than in the other, said pole will move towards the coil of greater electrical energy. The magnetic bar or armature will follow the shifting position of the pole, and by thus gradually varying the energy in the coils, the armature may be alternately caused to move from the pole of one coil along towards the pole of the other coil. The alternating current generated by an electrical machine, as before stated, constantly varies from maximum intensity to zero in one direction, and then from zero to maximum intensity in the opposite direction. In the invention of the patents in suit Tesla availed himself of this characteristic feature of alternating currents in the following way: In constructing a motor, he arranged on an annular soft iron core two pairs of magnetizing coils, each pair at right angles to the other,—that is, one coil of one pair at the top, and one at the bottom, and one coil of the other pair at each opposite side of said core,—and mounted an armature in the center. Then, connecting them with an alternating current generator, he caused a current from one pole of said generator to pass through one pair of coils, and a current from the other to pass through the other pair. If the cycles of alternating currents be regarded as divided into 360 degrees, then, as shown in the Tesla illustrations, they will have a relative displacement of 90 degrees. In such position the lines of magnetic force traversing the two coils will be at maximum in one while at minimum in the other. This relative displacement marks the different phase or time relation of the two currents. The effect of passing two equal currents through said coils would be to cause the pole of maximum intensity to pass midway between the poles of the respective pairs of coils. But the effect of the ordinary operation of the generator as before explained was to cause the current in each pair of coils to vary from zero to maximum and to zero, and then to shift in the opposite direction, the intensity of the current flowing to one pair of coils being at maximum while that of the other was at zero, and one increased while the other decreased, and the result being to shift said poles so as to make them travel entirely around said core."

Before the invention of Tesla, electric motors for use with continuous currents were employed for the distribution of power over areas such as were usually occupied by trolley systems, and such motors for electric railways are largely used. Alternating currents were extensively used for electric lighting, but the efficient use in a motor of a pure alternating current, in the form in which it was generated by the dynamo, for the transmission of power to a great distance for manufacturing purposes, was deemed, both by scientists and by electricians, to be impracticable; because if, by any means, by a change of load or otherwise, the speed of the motor got out of step with the generator, the motor would stop. The need was not of a system which would merely produce something to which the name "power" might be given, but of a system which would actually create continuous and uniform rotation of the armature without stoppage, whether loads were increased or decreased. The difficulty in the use of true alternating currents for transmission of power to a distance was that the alternations, which must be rapid in order to put out power, were so fast that the "armature did not have time to reach the proper position," and consequently stopped. As soon as synchronism was impaired, the transmission of power ceased. The difficulties in the use of a continuous current for power transmission are stated by Prof. Main as follows:

"The use of the continuous current in power transmission was limited by the cost of conductors, or by the difficulties which were encountered when high pressures were employed. With moderate pressures no very great amount of power could be transmitted to a considerable distance without incurring prohibitory expense, owing to the large size of copper conductors required under these circumstances. If, on the other hand, the electric pressure was greatly raised, so as to secure the transmission of a considerable amount of power over a comparatively small, and therefore inexpensive, conductor, other difficulties were encountered, such as excessive leakage in both generating and receiving machines, and also along the lines great danger to the life of the attendants, and frequently the destruction of electric machinery by short circuits, with the consequent burning out of coils and commutators. The difficulties of insulation were found to increase in almost geometrical ratio with the rise of potentials necessarily employed with increasing distance. The long-continued and expensive experiments of Deprez and others led to no practical results, although at one time they were eagerly watched as promising a solution of the problem. They served only to point out the serious and apparently insuperable obstacles which were encountered when an attempt was made to transmit power to a great distance by means of continuous currents at high potentials."

The Tesla invention, which was for the purpose of so utilizing true alternating currents that a continuous rotary effort and a continuous rotary result could be produced is described by Prof. Main as follows:

"I understand that the Tesla polyphase system consists in the production of two or more alternating currents, having relatively successive periods of maximum intensity, and their combined use in such a manner as to create a continuous rotary effort upon the armature of the motor. This invention of the means of producing a continuous rotary effort by alternating currents solves the problem of power transmission to great distances, for it added to the known methods of transforming the pressures of alternating currents, the lacking element which conferred upon the motor the power of starting without external aid, and of continuing motion while doing work up to the limit of its capacity."

And by Judge Townsend as follows:

"The underlying thought disclosed and applied in the Tesla patents is such a use of the rapidly successive opposing alternations of the alternating current regularly and constantly recurring in such differing phases as would not only prevent the alternations from stopping the armature, but would become a source of power. It was essential to the practical development of this idea that the alternations should rise and fall and succeed each other progressively and constantly, and should be arranged, as counsel for complainant puts it, 'like the crank on a locomotive, in which there is no dead center, but one crank is always pushing forward.' Tesla's invention, considered in its essence, was the production of a continuously rotating or whirling field of magnetic forces for power purposes by generating two or more displaced or differing phases of the alternating current, transmitting such phases, with their independence preserved, to the motor, and utilizing the displaced phases as such in the motor."

The novelty, importance, and remarkable promise of the invention, if it could be successfully reduced to practice, was immediately acknowledged by electrical scientists, and its ultimate practical and admitted success in the utilization of alternating currents for the transmission of power to a distance has justified the pleasure with which the invention was received when first communicated to the public.

The claims of the patents in suit which are in issue are as follows:

Patent 381,968:

"(1) The combination, with a motor containing separate or independent circuits on the armature or field-magnet, or both, of an alternating current generator containing induced circuits connected independently to corresponding circuits in the motor, whereby a rotation of the generator produces a progressive shifting of the poles of the motor, as herein described."

"(3) The combination, with a motor having an annular or ring-shaped field-magnet, and a cylindrical or equivalent armature, and independent coils on the field-magnet or armature, or both, of an alternating current generator having correspondingly independent coils, and circuits including the generator coils and corresponding motor coils in such manner that the rotation of the generator causes a progressive shifting of the poles of the motor in the manner set forth."

Patent 382,280:

"The method herein described of electrically transmitting power, which consists in producing a continuously progressive shifting of the polarities of either or both elements (the armature or field-magnets or magnets) of a motor by developing alternating currents in independent circuits, including the magnetizing coils of either or both elements, as herein set forth."

Patent 382,279:

"(1) The combination, with a motor containing independent inducing or energizing circuits and closed induced circuits, of an alternating current generator having induced or generating circuits corresponding to and connected with the energizing circuits of the motor, as set forth."

"(2) An electro-magnetic motor having its field-magnets wound with independent coils and its armature with independent closed coils, in combination with a source of alternating currents connected to the field coils, and capable of progressively shifting the poles of the field-magnet, as set forth.

"(3) A motor constructed with an annular field-magnet wound with independent coils and a cylindrical or disk armature wound with closed coils, in combination with a source of alternating currents connected with the field-magnet coils, and acting to progressively shift or rotate the poles of the field, as herein set forth."

The defendant, in discussing the subject of novelty, does not find the polyphase method of transmitting power, or the combination described in the motor patents for the accomplishment of the new purpose, to have been anticipated in any one mechanism; but it attempts to show that essays and patents prior to Tesla's invention described enough in regard to the effect of the combination of motors with different kinds of currents to deprive the Tesla system of patentable invention. The paper of Walter Bailey read before the Physical Society of London in 1879; the articles by Marcel Deprez in 1880–84, the principal one being "on the electrical synchronism of two rotative motions and its application to the construction of a new electrical compass"; the Siemens English patents of 1878; and the application of May 9, 1887, of Charles S. Bradley, upon which letters patent of the United States were subsequently issued on October 2, 1888, and after the date of issue of the Tesla patents,—are principally relied upon. Many years ago Arago produced in his laboratory an electrical toy, which Mr. Bailey describes as consisting of a copper disk suspended by its center so as to make it lie above the poles of a horseshoe magnet, which was then rotated about a vertical axis, and the copper disk was in consequence rotated, its rotation being due to that of the magnetic field in which it was suspended. Mr. Bailey thought that if a similar motion of the field could be produced by any other means, the result would be a similar motion of the disk. He made another laboratory experiment, which was successful, and the object of his paper was to show "that the disk can be made to rotate by an intermittent rotation of the field effected by electric magnets." So far as is known, the apparatus has been even since confined to its original use as an electrical toy. Bailey's statement of the object and the result of his experiment is sufficient to show that he neither thought of nor unconsciously aided in solving the problem of transmission of power by electrical currents of any kind. It is certain that the use of two true alternating currents of different phase for the purpose of producing a change of the magnetic field was not suggested by him. The Siemens British patent of August 7, 1878, was granted upon a communication by Werner Siemens and Hefner Von Alteneck, two distinguished electricians. The patent was especially for improvements in arc lighting in which alternate currents were used. The drawings showed continuous current machines and those capable of being both continuous and alternating, and the part of the specifications upon which reliance is placed is that:

"It is to be understood, as above stated, that with suitable modifications these apparatus are generally applicable also as electro-dynamic machines, their rotary parts being caused to revolve and give out mechanical power when electricity is applied to them. And thus one of these machines may be driven by any suitable motor power so as to generate electricity, and this electricity may be conducted to a similar machine at a distance, causing it to work and to give out a portion of the power applied in the first instance."

No modifications are described, and there is no suggestion that the patentee thought of such connections between a generator and motor, each of two phases, as to preserve the phases of the two

and the difference of phase, and that currents should act independently, and regularly succeed each other, and thereby keep the armature constantly rotated. The mechanism of the Siemens machine was of the class that, as the complainant's expert says, "could, by properly taking off their currents, have been used as polyphase machines; and also that, if any one had coupled two of these properly arranged machines in a certain way, and used them in a certain way, the system so produced would have involved the inventions afterwards made by Tesla." The way in which to couple these machines together for the purpose of transmission of power by pure alternating currents remained an unsolved mystery for 10 years, although the scientists were eager in the search for the secret, and neither Siemens nor Von Alteneck supposed that they had approached a solution. The hints in the patent respecting the modifications by which the inventors' apparatus for the conversion of power into electricity can be made to give out mechanical power are and were valueless, as no modifications are described, as the kind of mechanism to be modified is uncertain, and as independence of phase was not in the contemplation of the patentees. The defendant, however, says, and the assertion is made of great importance upon the whole question of patentability, that the skilled electrician knew that the dynamo electric generator could be reversed so as to give out mechanical power, and therefore it was not necessary for Siemens or any other person to instruct the public how to make modifications. The point in regard to the principle of reversibility is stated in the defendant's brief as follows:

"It is a principle which is not confined to continuous current machines or to single phase, two phase, or multiphase machines; and, being so recognized, it belonged to those skilled in the art to run such apparatus as generators, or to supply them with currents from similar machines and run them as motors, and all without the exercise of the inventive faculty."

Therefore the defendant thinks that this reversibility of the Siemens or Bradley apparatus is all that there is to the principal patents of Tesla. The assertion in regard to the knowledge of reversibility is true in a certain sense, yet it is misleading, and does not tend to prove the desired conclusion. The proposition is that before the date of the Tesla inventions the reversibility of the dynamo electric generator was universally known, and therefore that, when Tesla saw the use of a two-phase alternating current from a dynamo electric generator, he knew that it would operate in the reverse way, and would generate power, if supplied with the currents which it generates, and therefore he knew that if he reversed it the alternating current would be used to furnish power at a distance. The conclusion does not follow, for there is a wide distinction between the use of an alternating current for what may by courtesy be called power, and the use for transmitting power for manufacturing purposes to a distance. As said by Prof. Main:

"By 'great distance' I mean one considerably greater than that over which power is usually transmitted in trolley systems, for which, as is well known, a moderate potential suffices. The problem of power transmission over great distances remained not only unsolved, but was apparently no nearer

solution, at the time of the commencement of Tesla's inventions, than it had been for several years previously, although it was a subject of constantly increasing interest."

Furthermore, the proposition, while true in regard to direct current machines, was only a matter of theory, and not of practice, in regard to alternating current motors for power purposes. The general statements in the books in regard to the reversibility of dynamo electric machines have particular reference, as a known fact, to a supply with direct currents, but as to alternate currents with alternate current machines as motors the scientists relied upon surmises. For example, the English electrician Hopkinson believed in 1884, and declared in a paper published in 1890, that "alternate currents with alternate current machines as motors may theoretically be used for the transmission of power"; and Prof. Sylvanus Thompson, in the edition in 1886 of his valuable work, declared, what was the universal opinion, that "for the purpose of supplying motors alternate current machines are not yet practically available." Declarations that electric light machines could be so reversed as to furnish power were merely theoretical, and gave no information to the public or to the inventor of the method by which reversibility was to be made useful to accomplish any result. Furthermore, the proposition assumes that the inventor who undertook to use two current alternating machines as motors would naturally and without invention use two transmitting circuits, and that they would be so arranged as to preserve the electrical independence of each phase. Neither part of the assertion is based upon sufficient evidence, and if it is meant that the mechanic would, without the exercise of invention, make such an arrangement in order to preserve the independence of phase, the assumption is very far from the truth, for the conception of the practical way by which alternating currents could be used to transmit power to a distance was the result of inventive thought and study. It is said, however, that Bailey, in 1877, taught the art how to make a two-phase induction motor, and how to connect such motor to a two-phase source. Bailey, in his experiments with reversed currents, did not attempt to produce, what Tesla must have, a continuously rotating field.

Another general proposition on the subject of nonpatentability is that reversed and alternating currents are equivalents, and were known to be such at the date of the Tesla inventions, and that, therefore, there was no invention in substituting an induced alternating current for Bailey's reversed current. The reversed currents which are meant are alternate currents converted by means of a commutator into direct currents, and again reconverted at the motor, by another commutator, to an alternating current. The defendant is again attempting to transfer general expressions used by authors in regard to one subject, which may and may not have been true, to a subject to which they are not at all applicable. Reversed currents and alternating currents, though they may be equivalents for some purposes, —such as electric signaling,—are not equivalents for transmission of power to a distance, because reversed currents cannot practically be used for that purpose. This is pointed out by Tesla in his essay

which will hereafter be quoted at length. The "commutation" of heavy currents, which are necessary for transmission of power to a distance, is dangerous to the machines and to human life, and the use of such reversed currents for power is impracticable, as the experience of experimenters has shown. The principal reason has already been noticed, and is stated in the following sentence in the testimony of the complainant's expert:

"Perhaps the most important one is that in reversing direct currents the source must either be short-circuited—that is, have its terminals directly connected together—or else the circuit must be opened. The first of these is destructive of the generator, and there is a tremendous arc when the short circuit is removed, which destroys the commutator, and the breaking and subsequent sudden reversal of the current is impracticable because of the spark which enables the current still to flow, and which also destroys the commutator."

It is true that in the specification of patent 382,280 Tesla said, "With regard to that part of the invention which consists in acting upon both elements of the motor simultaneously, I regard the use of either alternating or reversed currents as within the scope of the invention, although I do not consider the use of reversed currents as of any practical importance;" but that sentence was subsequently disclaimed and is not now a part of the specification.

The application of Charles S. Bradley for a patent, dated May 9, 1887, is thought by the defendant to have significance on the subject of patentability. Bradley's alleged invention was a dynamo "which will generate an alternating or continuous current as desired." He described two currents obtained from the same machine, and says that they can be employed for any purpose to which alternating currents are applicable, and they may be used separately, one being used to feed one circuit and the other to feed another circuit; but he apparently did not, in his application, understand any benefit resulting from the transmission of two currents of different phase. The fact that they had a difference of phase was not of value as a source of power. It is not necessary to discuss the Bradley application, for its inefficiency, as related to Tesla's invention, is sufficiently stated by Judge Townsend as follows:

"Because Bradley's application is limited to scope, and ambiguous and indefinite; because it fails to show that he had any conception of the Tesla idea of 'the utilization of the motor for the purpose of progressively shifting the magnetic poles of a plurality of alternating currents by circuits which preserve the independence and differing time relation of their phases'; because, even if the idea had been first conceived by Bradley, it was not sufficiently described to disclose the principle or method of operation; because Tesla was the first to reduce this principle to practice Bradley does not anticipate or limit."

The defendant properly puts the most stress on the Marcel Deprez publications, because he disclosed the mathematics which Tesla utilized, and "gave a mathematical demonstration of the rotating field." Complainant's expert's admission on this point is as follows:

"The article demonstrated mathematically the fact, which is also stated in the Tesla patents, that the polar line of an annular magnet may be

shifted about through the entire circumference of the ring by the action of two magnetizing forces properly related."

The articles in "Comptes Rendus" of 1883 "on the electrical synchronism of two relative motions, and its application to the construction of a new electrical compass," describes his mechanism for the production of a resultant magnetic field by winding coils upon a ring in the manner described in the Tesla patent 381,968. The only application of the mechanism or of the rotating field which he suggested was "a new electric compass." This was all that Deprez practically effected by what is called "the theory of the parallelogram of forces," for he had no idea of the utilization of the principle or of alternating currents for the purposes of electrical power; and, indeed, he declared in a paper published in "La Lumiere Electrique" in 1884, "I must further remark that alternating currents are of no use in the transmission of power; they are suitable only for lighting purposes." What Deprez did was to show how a resultant magnetic field could be produced, but, as a matter of course, he did not describe or suggest apparatus for power. His electric signaling apparatus was not adapted for any other object. The armature was placed at the top of a mast. The action of the permanent magnet that served as indicator "was replaced by that of the earth, which is sufficient," and no continuous rotating field was required. His currents were so feeble as to be ineffectual for the transmission of power to a distance that they were not the alternating currents of Tesla. The invention, when Deprez left it, "did not depend upon any constant, regular, progressive currents, and, so far as the evidence shows, it was like the apparatus of Bailey, confessedly a mere laboratory experiment." His result of his remarkable mathematical investigations was summed up by Prof. Sylvanus Thompson, who said: "Deprez's theorem bore no fruit. It remained a geometrical abstraction."

It will thus be seen that attempts to use direct or reversed currents for the transmission of power to a distance had been a failure, and that the use of true alternating currents for that purpose was unknown. This history enables us to understand the character of Tesla's invention as he explained it in the paper which he read about a fortnight after the date of his patents to the American Institute of Electrical Engineers, and which was in part as follows:

"The transmission of power, on the contrary, has been almost entirely confined to the use of continuous currents, and, notwithstanding that many efforts have been made to utilize alternate currents for this purpose, they have, up to the present, at least as far as known, failed to give the result desired. * * * The subject which I now have the pleasure of bringing to your notice is a novel system of electric distribution, and transmission of power by means of alternate currents, affording peculiar advantages, particularly in the way of motors, which I am confident will at once establish the superior adaptability of these currents to the transmission of power, and will show that many results heretofore unattainable can be reached by their use; results which are very much desired in the practical operation of such systems, and which cannot be accomplished by means of continuous currents. Before going into a detailed description of this system, I think it necessary to make a few remarks with reference to certain conditions existing in continuous current generators and motors, which, although gen-

erally known, are frequently disregarded. In our dynamo machines it is well known we generate alternate currents, which we direct by means of a commutator, a complicated device, and, it may be justly said, the source of most of the troubles experienced in the operation of the machines. Now, the currents so directed cannot be utilized in the motor, but they must—again by means of a similar unreliable device—be reconverted into their original state of alternate currents. The function of the commutator is entirely external, and in no way does it affect the internal working of the machines. In reality, therefore, all machines are alternate current machines, the currents appearing as continuous only in the external circuit during their transit from generator to motor. In view simply of this fact, alternate currents would commend themselves as a more direct application of electrical energy, and the employment of continuous currents would only be justified if we had dynamos which would primarily generate, and motors which would be directly actuated by, such currents. But the operation of the commutator on a motor is twofold: Firstly, it reverses the currents through the motor; and, secondly, it effects automatically a progressive shifting of the poles of one of its magnetic constituents. Assuming, therefore, that both of the useless operations in the system—that is to say, the directing of the alternating currents on the generator and reversing the direct currents on the motor—be eliminated, it would still be necessary, in order to cause a rotation of the motor, to produce a progressive shifting of the poles of one of its elements, and the question presented itself how to perform this * * * operation by the direct action of alternate currents? I will now proceed to show how this result was accomplished."

He abandoned the use of reversed currents with their troublesome and dangerous commutators. He employed true alternating currents, differing in phase, and by means of their "rapidly successive opposing alternations" in a motor having corresponding circuits he created a continuously rotating field. The apparatus by which his system was manifested consisted in the use of two or more regularly and rapidly recurring true alternating currents, generated by a dynamo, differing in phase, and not interfering with each other, the alternations so arranged as to regularly succeed each other, connected to a motor having "a plurality of circuits in which alternating currents of different phase are produced" without interference with each other, the currents of the generator being connected to the motor by connections so as to preserve the succession of phase by means of which the magnetic poles of the motor are constantly and progressively shifted. The successive increasing and decreasing alternations of the currents so regularly succeed each other that there never is a "dead center" in the onward movement within the motor. The use of true alternating currents, and the means by which they were made to create a continuously whirling field by their direct action, constituted an invention of a remarkable character. Giving to Deprez's theorem all the value to which it is entitled, its application by Tesla to the production of a new, original, and most beneficial practical result by new and described means and the use of polyphase alternating currents,—in brief, by the polyphase system,—and the apparatus of Tesla was an invention of a very high order. The defense of nonpatentability was elaborated in the record in the most painstaking manner, and with abundant reference to statements and theories of scientists who preceded Tesla, and who were trying to discover the laws of a mysterious natural force, the utilization of which is still

far from complete development. Each was prospecting in a mine not thoroughly explored, and dimly lighted, and each produced something of value; but the attempt to minimize Tesla's invention of the method of successfully using electricity for very important purposes by means theretofore thought to be impracticable rested upon a very inadequate foundation.

. The question of infringement remains to be considered. The defendant uses at its granite works in Concord, N. H., three motors called "Cushman Motors." The three-phase alternating current by which these motors are operated is furnished from a three-phase alternating generator at a water power station on the Merrimac river a distance of 3¾ miles from the granite quarry. "In this construction no circuit consists of two conductors specially devoted to any one of the differing-phase currents. In the patented apparatus each one of the independent circuits is specially devoted to a single one of the differing-phase circuits." Claim 1 of No. 381,968 requires separate or independent circuits on the armature or field-magnet, and each patent also calls for independency of circuits. The defendant therefore insists:

"That the term 'independent,' as used by Tesla, means such separation as is consistent with having the complete circuits traversed by the same currents,—currents which at any and every point are of the same quantity, intensity, and phase,—so that, as Mr. Clarke puts it, each motor circuit receives its current from a corresponding generator circuit, and from no other. It cannot refer to circuits which are interdependent in such sense that two of the circuits are at times strictly in series with one another and in multiple with the third, and so are not 'independent' in any sense. The whole system is an interdependent, and not an independent, system."

In other words, the defendant construes the claim of each patent to require physical independency of circuits. In this connection it is proper to quote one clause of the specification of No. 381,968, in which the patentee said:

"By 'independent' I do not mean to imply that the circuits are necessarily isolated from one another, for in some instances there might be electrical connections between them to regulate or modify the action of the motor without necessarily producing a new or different action."

The meaning of the clause is that independent circuits are not necessarily circuits isolated from each other, and that electrical connections are permitted, if they do not interfere with the electrical independency of the circuits. Upon the question whether the so-called interdependency of the defendant's circuits carries its system outside of the Tesla system much space is occupied in the record, and, if the defendant's contention is correct, the Tesla patents are worthless to their owner, because, in order to accomplish the Tesla result, actual physical separation and isolation of the circuits is not at all necessary. It is an evident fact that the defendant's circuits are operatively independent, and that, as the word "independent" is used by electricians, they are electrically independent. The word was used, as it was wont to be used by electricians, to mean independent in an electrical sense. With the conclusion of Judge

Townsend upon this much-discussed question of the interpretation of the adjective "independent" we entirely agree:

"Inasmuch as the defendants have not invented any new idea, but have adopted an old contrivance which performs the same result in substantially the same way by a formal and unsubstantial change in means, and by circuits which, while in some sense interdependent, are operatively independent, and which preserve and utilize the vital element independence of phase, these circuits must be held to be the equivalents of the independent circuits of the patent, the word 'independent' being interpreted to mean operatively independent, so as to embrace the true spirit and essence of the Tesla invention."

The defendant also makes the point upon the subject of infringement that patents Nos. 381,968 and 382,280 are limited to synchronous motors, and therefore are not infringed by the defendant's nonsynchronous motor. The defendant defines the difference as follows:

"Alternating current motors are synchronous and nonsynchronous, depending on whether their armatures rotate at the same speed as the element in the generator which produces the alternations."

The defendant asserts that the two broader patents in this case, one for the Tesla method and the other for the mechanism by which the method was carried into practice, described synchronous motors. On the other hand, it is said that they described both classes, because, the motor of the system shown in Fig. 9 was nonsynchronous. Whether this is true or not, it is not, in our opinion, important to decide, because, assuming that the patents did describe synchronous motors only, and that synchronism was one of the confessed advantages of the system, the claims of patents 381,968 and 382,280 did not make, and did not intend to make, synchronism a part of either claim, but were for the invention which was broadly described in the single claim of patent 382,280 and in claim 1 of patent 381,968. These claims rightfully gave to Tesla the benefit of the use of what he called his "novel system of electric distribution and transmission of power by means of alternate currents," whereas patent No. 382,279 was for the motor specially described therein, having in claim 1 the element of closed induced circuits, and which is said to be nonsynchronous.

Noninfringement of claim 3 of No. 381,968 and claim 3 of 382,-279, upon the ground that the defendant's field-magnet is not annular or ring-shaped, is also suggested. Its magnet is ring-shaped, having slots on the inner face for imbedding the conductors, and the objection is without substance.

The defendant attempts to escape the charge of infringement by introducing into the claims limitations which are not called for by their language, or by the scope of the invention, and by forgetting the position of the invention in the development of the use of alternating currents for power purposes. The decree of the circuit court is affirmed, with costs.