MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. DE FOREST RADIO TELEPHONE & TELEGRAPH CO.

(Circuit Court of Appeals, Second Circuit. May 18, 1917.)

No. 206.

1. PATENTS ⊜⇒312(2)—SUIT FOR INFRINGEMENT—OPINION EVIDENCE.
     Theories concerning phenomena observed in wireless telegraphy, which are not the same as were held by the witnesses a short time before, and which they admit are only theories, are not legal evidence.

2. PATENTS ⊜⇒16—VALIDITY.
     That a patentee does not understand his own mechanism will not invalidate the patent, if it is described and produces a new result.

3. PATENTS ⊜⇒36—INVENTION—MECHANICAL EMBODIMENT OF THEORY.
     To constitute patentable invention, in addition to a theory or mental concept, there must be a tangible reduction to practice; and the transformation of a laboratory experiment into a successful and useful mechanical device is evidence of such tangible reduction to practice and of invention.

4. PATENTS ⊜⇒328—VALIDITY AND INFRINGEMENT—DETECTOR.
     The Fleming patent, No. 803,684, for a detector used in wireless telegraphy, discloses patentable invention and a meritorious device, and is valid; also held infringed.

5. PATENTS ⊜⇒155—DISCLAIMER—PURPOSE AND EFFECT.
     A disclaimer is valid which only abandons something claimed in the patent, but not needed, without broadening or enlarging any claim, and leaving the claims fully supported by the original specification.

6. PATENTS ⊜⇒328—VALIDITY—DETECTOR.
     The De Forest patent, No. 841,386, for a detector for wireless telegraph apparatus, is void as inoperative.

7. PATENTS ⊜⇒328—INFRINGEMENT—DETECTOR.
     The De Forest patents, No. 824,637, No. 836,070, No. 867,876, No. 867,877, No. 867,878, and No. 979,275, all for detectors for wireless telegraph apparatus, held not infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Marconi Wireless Telegraph Company of America against the De Forest Radio Telephone & Telegraph Company.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Decree for complainant, and dismissing counterclaim, and defendant appeals. Affirmed.

For opinion below, see 236 Fed. 942.

The plaintiff (hereinafter called Marconi) brought this action against defendant (hereinafter called De Forest) alleging infringement of claims 1 and 37 of patent dated November 7, 1905, issued on application of John Ambrose Fleming, filed April 19, 1905 (No. 803,684). The claims in suit are as follows:

"1. The combination of a vacuous vessel, two conductors adjacent to, but not touching, each other in the vessel, means for heating one of the conductors, and a circuit outside the vessel connecting the two conductors."

"37. At a receiving station in a system of wireless telegraphy employing electrical oscillations of high frequency, a detector comprising a vacuous vessel, two conductors adjacent to, but not touching, each other in the vessel, means for heating one of the conductors, a circuit outside of the vessel connecting the two conductors, means for detecting a continuous current in the circuit, and means for impressing upon the circuit the received oscillations."

After action begun, plaintiff entered a disclaimer "to the combination of elements set forth in claim 1, * * * except as the same are used in connection with high-frequency alternating electric currents or electric oscillations of the order employed in Hertzian wave transmission," and also to certain words of the specification referring to low frequency currents.

Action was brought, not only against the present appellant, but Dr. Lee De Forest individually. The bill as to him was dismissed, and no appeal taken thereto. Defendant answered, and set up a counterclaim (practically a separate action), alleging that Marconi had infringed and was infringing certain claims (not necessary to specify) of the following patents belonging to defendants, viz. Nos. 867,876, 867,877, 867,878, and 979,275, which four issues resulted from division of a single application filed February 2, 1905. The counterclaim alleged, further, infringement of patents Nos. 824,637 and 836,070. Of these, 836,070 is a division of an application thought to cover both inventions and filed January 18, 1906. Defendant also counterclaimed upon patent 841,386, application filed August 27, 1906. Thus the counterclaim was tried on the foregoing seven patents, of which the first four antedate Fleming. The counterclaim, however, also set up two other patents, Nos. 841,387 and 879,532, both of date, not only later than Fleming, but later than any of the other and above enumerated patents. As to these plaintiff permitted defendant to take a decree at or shortly before trial.

The lower court (Mayer, J.) held that De Forest had infringed both the claims in suit of the Fleming patent, and that Marconi had not infringed any of the claims of the patents set up in the counterclaim and not confessed. All of defendant's patents had been issued on applications of Dr. Lee De Forest, and will hereinafter be referred to collectively as the De Forest patents. From a decree granting injunction on the Fleming patent, and dismissing the counterclaim, De Forest took this appeal.

Frederick P. Fish, of New York City (Philip Farnsworth, Harrison F. Lyman, and George F. Scull, all of New York City, on the brief), for appellant.

J. Edgar Bull, of New York City (L. F. H. Betts and Ramsay Hoguet, both of New York City, on the brief), for appellee.

Before COX, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The subject-matter of this action is a "detector." That word will be used in this decision as signifying any device, or piece of apparatus, which, when energized, actuated, or acted upon by or by means of the so-called Hertzian waves, enables man, through the senses of hearing or sight, to understand signals based upon the intentionally regulated emis-

sion or propagation of the waves aforesaid. The patent of the bill is said to cover and protect a detector, hereinafter called the "Fleming valve." Defendant uses a detector which it calls the "audion." Plaintiff asserts that, while the audion may be for some practical purposes an improvement on the Fleming valve, it is nevertheless an infringement, and it has given evidence of faith in its own theory by admitting infringement of the two patents (hereinabove specified) which essentially describe one form of audion—known herein as the "three-electrode" apparatus.

Defendant, not content with this admission, insists: (a) That the Fleming valve was not patentable, considering the state of the art at date of application; (b) that the valve and the audion utilize and depend for efficacy upon wholly different operations of nature; and (under its counterclaim) (c) that the De Forest patents still in suit cover devices in principle identical from the earliest to the latest, which patents Marconi has infringed by using a device named by the defendant the "two-electrode" audion.

It is said that Dr. De Forest disclosed by his earlier patents, and before Fleming filed his application, a theory which, reduced to practice, resulted in the perfected audion of the confessed patents, wherefore the device of every one of the De Forest patents is (by defendant's witnesses) called an audion, although that word was not coined until shortly before applications for the confessed patents were filed. To paraphrase an argument, it is said that Marconi cannot logically confess judgment under two patents, and yet deny infringement of the earliest De Forest inventions, because they all constitute a connected, logical, coherent development of a single inventive thought or application of a scientific theory.

[1] These contentions have opened the door (without objection, or very little) to a mass of opinion evidence, which in our judgment is of no legal value. Much of this record arises out of the mystery still notoriously enveloping the wave movements of the imponderable ether; that is, out of the nature of phenomena by which none of our five senses are directly affected. It consists of opinions or theories concerning such phenomena—opinions necessarily subject to revision, perhaps in a few months. The principal producer of such evidence (if it can be so called), Mr. Pickard, for the defendants, admitted repeatedly that the views he advanced on the witness stand he had not entertained a little time earlier, though he had apparently given his abandoned theories more publicity than normally attaches to testimony in a patent cause. He would probably be the last to assert that his present opinions are final, even for himself. To call such theorizing evidence is a misuse of the word; for the patent law can deal little in such matters. Neither a process of nature nor the discovery thereof is patentable. Man-made statutes permit to be protected and monopolized only some perceptible means or certain method of harnessing or utilizing forces, however mysterious, uncertain, or perhaps incomprehensible. The only question in this case is whether some known operations of nature were, by proved, tangible, and visible implements, harnessed and made useful; if so, he who first did it may be protected in what he did in accordance with statute laws.

Why a given device works, or the theory of its functioning is a fascinating inquiry; but, unless that "why" can be proved within the very modest limits of legal evidence, opinion evidence becomes the rampant speculation of this transcript. It is usually impossible for trial courts to limit opinion evidence (for fear of losing something of value), but efforts in that direction are much needed in the interest of celerity and clarity. Counsel introducing experts who use the witness chair as a rostrum confer no benefit on their clients.

The Fleming valve as a detector confessedly, and the actual commercial "audion" (as we are convinced) consist essentially in the utilization by visible and tangible means of what has long been known as the "Edison effect," which means the fact that, when there is introduced into the ordinary incandescent electric lamp bulb an electrode other than the incandescent filament (such unheated electrode being connected with the positive terminal of the lamp), a current flows from the incandescent electrode to the cold one, in such wise that variation in the electromotive force, producing incandescence, will be reflected or reproduced in the circuit connected with the cold electrode, such variations being capable of measurement by a galvanometer. Edison, Patent No. 307,031.

Utilization of the Edison effect does not mean that the use of Edison's apparatus or any modification thereof as a detector was easy or simple. The admitted fact that years passed, and detectors of various kinds from the coherer to the crystal acquired vogue, before any one thought of using Edison's curiosity of electricity for the discovery or translation of Hertzian waves, is proof enough on this point. Fleming was the first to disclose an apparatus for this purpose. His specification declares that he "rectifies" the alternating current transmitted from the antenna. Defendant's witnesses declare that rectification means converting "the received alternating current into direct currents," and they spend much time in attacking Fleming's theory of the operation of his own device.

[2] But the law is not concerned with why the process called rectification takes place, or how it is accomplished, further than to observe that variations in group frequencies of an alternating current passing through an incandescent lamp filament produce in a manner analogous to the observed Edison effect a direct pulsating or intermittent current in the cold electrode circuit, and that these pulsations or intermittances mark the kind of current whose varying energies can be read with a galvanometer or a telephone. Whether Mr. Fleming's theories of rectification were right or not has nothing to do with the question of invention or validity. The patentee may not understand his own mechanism; but if he shows and describes it, and it produces a new result, the law is satisfied. Van Epps v. United, etc., Co., 143 Fed. at page 872, 75 C. C. A. 77. Therefore the first question (as stated by appellee) is substantially this: Was it invention to use, "as a detector of wireless waves, an Edison hot and cold electrode lamp"? This is a question of fact, and we arrive at the conclusion of the lower court that at the date of Fleming's application it was not known to men skilled in the radio art that a rectifier would act as a detector, or that anything that would rectify oscillations of low frequency could rectify

waves of the order used in radio communication. Edison's patent stated a fact and suggested a tantalizing mystery, because even he did not pretend to state, or assert that he knew, why his "effect" took place. His disclosure remained (so far as we can discover from this record) a laboratory problem until Fleming applied it (whether with a wrong theory or a right one is immaterial) to a new and very practical field of usefulness.

[3] While "invention" is a word the definition of which the courts do not attempt (McClain v. Ortmayer, 141 U. S. at page 427, 12 Sup. Ct. 76, 35 L. Ed. 800), many of the elements contributing to its significa- tion may be and have been described; there must be more than a theory or mental concept, viz. a tangible reduction to practice (Corrington v. Westinghouse, etc., Co., 178 Fed. at page 715, 103 C. C. A. 479), and the transformation of a laboratory experiment into a successful and useful mechanical device is evidence of such tangible reduction to prac- tice and of invention (Westinghouse, etc., Co. v. New England, etc., Co., 110 Fed. 753, 49 C. C. A. 151). In this case, while it is true that Fleming's detector uses the Edison effect every time it detects, the step from a toy to a use suggests what was said in Hobbs v. Beach, 180 U. S. at page 392, 21 Sup. Ct. at page 409, 45 L. Ed. 586, viz. that while there was an analogy there was not similarity between the func- tions of the patented device and of the alleged anticipating apparatus. The point is not capable of much argument, the appeal is to a kind of conscience, and the court or jury intuitively and conscientiously feel either that invention is absent, or that something akin to genius is dis- played in the visible, tangible result of the mental concept.

[4] We have no doubt that Fleming's patent displays invention, and of a very meritorious device. Assuming, now, the validity of the patent, it is upon the question of infringement that this record has been filled with theories, until it is necessary to call firmly to mind that what is complained of as an infringement is not a theory or a function, but a thing compact of glass and metal, made and sold by defendant as the "three-electrode audion" or "P N detector."

Defendant insists that even if Fleming's patent is valid, even if the audion may exhibit at times the Edison effect, yet, since knowledge of that phenomenon antedated Fleming, they and all the world can avail themselves of Edison's knowledge, even in detectors, if their detectors function in a different way or produce substantially different results from those of Fleming (Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935). Accordingly it is asserted that the audion is not merely an incandescent light bulb with two cold electrodes (instead of one) inside it, but an apparatus in which the bulb contains "a substantial amount of gaseous medium" essential to operation of the device, and, further, that a certain arrangement of circuits, the use of condensers, and the introduction of a battery into the cold electrode circuit, are all elements which in combination constitute the audion, produce the "audion ef- fect," and render the completed whole a different thing from anything Fleming thought of.

The "audion effect" is more specifically this. The battery circuit produces a constant current through the telephone. The input or ar- riving oscillations, passing through a condenser, and thence from in-

candescent filament (and grid) to the battery circuit, would not of themselves be normally strong enough to excite the telephone; but they can and do produce changes in the battery current sufficient for that purpose. They (so to speak) pull a trigger, and this trigger action is the audion effect, wherefore the audion is not a rectifier, but an "amplifier." It seems clear to us that some of the foregoing is disingenuous, and more immaterial. The "gaseous medium" of the audion is nothing but the commercial vacuum of the ordinary electric light bulb —air being a gas, and the bulb containing some residual air. In other words, defendant uses the same "vacuous vessel" that Fleming does.

As for the "trigger action," "audion effect," and such-like clever phrases, they merely hide the real inquiry, viz. how do the high frequency oscillations, or any part of them, or their electrical result or influence, get into the indicator or battery circuit, no matter what they do after arrival? Plainly it is done just as in the Fleming valve. This is the one act, or step, which is essential to either a valve or an audion being a detector, and Fleming's invention consisted in producing a detector, which Edison did not do. A detector must act on alternating currents. This it is that makes defendant an infringer by the manufacture and sale of what may be, and probably is, an improved detector.

[5] The contention that Fleming's patent, whatever its original merit or lack thereof, was voided by an unlawful disclaimer, is without substance. The mistake (if there was one) was in claiming something not needed, and the disclaimer abandoned what was not wanted, without broadening or enlarging any claim; it also left the claims fully supported by the original specification. No injury to defendant, or any one else, is shown. The procedure is within Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968, and our former decisions in Simplex, etc., Co. v. Pressed Steel Co., 189 Fed. 70, 110 C. C. A. 634, and Strause, etc., Co. v. Crane Co., 235 Fed. at page 129, 148 C. C. A. 620.

[6, 7] The position of defendant in respect of the counterclaim patents has been given, but, as put by counsel, it is as follows:

"De Forest was the first inventor of a detector comprising a local circuit, containing a battery and a telephone, this circuit having terminal electrodes in a gaseous medium such as air, made conductive by electrode heating by electric means."

This is not the whole thesis, but it is enough for present purposes. The position thus defined amounts to asserting that, if defendant can show that the inventor had one thought running through his mind, and produced a series of patents for what from time to time appeared to him the best current embodiments of that thought, therefore any one who constructs another apparatus, utilizing the same theory of action, must be an infringer of the whole line of patents.

While not accepting such view of the law, we shall first ascertain what visible objects plaintiff has made, sold, or used which are said to infringe the counterclaim patents. The detectors called by defendant "Marconi's earlier infringement" or the "two electrode audion" are especially complained of, though, since it is agreed that the "two" and "three electrode audions" operate on the same basic principle, no rea-

son appears why defendant must not contend that the same things which admittedly infringe the confessed patents also infringe all the counterclaim patents.

But, even on defendant's summary of these De Forest patents, there can be no infringements if, as matter of fact, the patentee (1) was not the first to disclose a detector with the enumerated characteristics; or. (2) never disclosed or patented as an element of his device "terminal electrodes in a gaseous medium such as air"; or (3) if the devices of the counterclaim patents still in suit are for any reason different in kind from those covered by the confessed patents; or (4) if the patents in suit on the counterclaim are inoperative or invalid.

(1) De Forest was certainly not the first to disclose or invent a detector comprising a local circuit containing a battery and a telephone, and we find it true that the so-called "two-electrode audion" is no more than a Fleming valve with and in a circuit with adjuncts antedating both De Forest and Fleming.

(2) The expression "gaseous medium, such as air," is an endeavor to conceal what we regard as the plain disclosure of all the counterclaim patents based on original applications dated February 2, 1905, and January 18, 1906, viz. that the patentee's fundamental concept was to produce conductivity by heating. He thought and taught that heated air, or the heated gases of (e. g.) halogen salts, when the point of disassociation into positive and negative ions was reached, produced a medium favorable to conductivity. Neither of plaintiff's devices operates on any such principle; whether there is any merit in De Forest's disclosure is immaterial.

(3) We agree with the court below that the radical difference between the disclosures of the first six counterclaim patents and anything shown to have been used by Marconi is apparent on inspection; because none of De Forest's devices utilize a commercial vacuum, or what defendant's expert called a vacuum of the order of an ordinary electric light.

(4) The seventh counterclaim patent (841,386) is proved to be inoperative. The patentee declares that by "suitably varying the length of interelectrode medium" he can make the audion "per se selectively responsive." Assuming this last phrase to mean "make it work," defendant at the trial did not do it, and we think refused to try.

It follows from the foregoing that we hold patent No. 841,386 void, and all the other patents of the counterclaim (still in suit) not infringed.

It is not often that any case contains so much history as does this one. It is true that Dr. De Forest, through the whole line of the counterclaim patents, sought after a commercially useful detector, and ultimately produced one; but it is not true that he consistently followed one concept or theory and tried to reduce that to practice. He began with the heated gas theory; he ended with the three-electrode audion, employing the commercial vacuum, and before he produced that success he learned of Fleming's invention and the latter's address before the Royal Society. He promptly used the knowledge so acquired, and it is the endeavor to connect these differing lines of effort and conceal their lack of normal connection that has produced the theorizing of this record, and also the persistent use of the word "audion" as applied

even to the earliest De Forest patents, which are of dates before that word was coined.

Among the curiosities of evidence in this record are numerous extracts from technical periodicals giving the opinions of the authors on the subject-matter of this suit. One from The Electrician, of November 21, 1913, is a just comment on the cause:

"We think that Dr. De Forest might be more generous in his acknowledgment of the work of Dr. J. A. Fleming. Our readers generally will probably agree that the audion, although differing widely from the Fleming valve, is an offshoot of it."

The decree below is affirmed, with costs.