MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. DE FOREST
WIRELESS TELEGRAPH CO.

(Circuit Court, S. D. New York.   April 11, 1905.)

PATENTS—INFRINGEMENT—WIRELESS TELEGRAPHIC APPARATUS.

 The Marconi reissued patent No. 11,913 (original No. 586,193), for im-
provements in transmitting electrical impulses and signals, and in ap-
paratus therefor, while for a combination of elements all of which were
taken from the prior art, discloses the first practical wireless telegraphic
system, and shows invention of a primary character, which entitles it to
a broad construction and a liberal range of equivalents.  As so construed,
it is not limited to receiving conductors wholly insulated from the earth at
both their upper and lower ends, nor to the suspended plates described,
but covers also conductors consisting of aerial wires having an earth con-
nection at the bottom.   Claim 1 of the reissue in attempting to claim
broadly every form of imperfect contact device in the receiver, goes beyond
the original patent, and cannot be sustained, in view of the prior art.
Claims 3 and 5 *held* infringed by the apparatus of the De Forest and
Smythe patents, which cover an equivalent, imperfect contact device.
Claims 8, 10, and 24 *held* not infringed.

Frederic H. Betts, for complainant
Philip Farnsworth, for defendant.

TOWNSEND, Circuit Judge.   This suit, by bill and answer, rais-
es the questions of the validity, and of infringement by defendant,
of complainant's reissued patent No. 11,913, granted to Guglielmo
Marconi June 4, 1901, for improvements in transmitting electrical
impulses and signals and in apparatus therefor.   This patent is the
reissue of the fundamental Marconi patent, No. 586,193, dated July
13, 1897, for transmitting electrical signals.   The issues involved
relate to the art of wireless telegraphy, and more especially to its
latest development, sometimes termed "spark telegraphy."

Prior to 1887 the dreams and forecasts of electric telegraphy
without wires found realization and tangible shape in apparatus
which utilized either the conductive properties of earth or water,
or the principle of induction.   The Dolbear system and apparatus
of 1884 will be separately considered.   The conduction system was
preferably employed on the banks of bodies of water, and comprised
primary and secondary circuits on the opposite banks, consisting
of wires stretched along the bank on either side, and connected to
the ground or water, and provided with batteries and galvanometers
or telegraph or telephone instruments.   By means of such apparatus
currents of electricity generated by the battery in the primary
circuit, on one side of a stream, for example, passed to the terminal
of the wire in the secondary circuit, on the other side of the stream,
and, by means of circuit making and breaking connections, signals
were transmitted to the receiving apparatus.   The distances covered
by this system were limited to one or two miles.   The second meth-
od depends on the principle of induction, or the influence of one
conductor on another through an insulator, based on the discovery
that, if two circuits—one having a battery and being the primary

138 F.—42

circuit, the other being the secondary circuit—are parallel with one another, a current made or broken in the primary circuit induces a transient or momentary current in the secondary circuit. This system was utilized by apparatus similar to that employed in the conduction method, and for about the same distances. The Dolbear system—so called from the name of its great inventor, Prof. Dolbear, of Tufts College—appears to have utilized the induction principle. By means of elevated conductors, vertical wires, and grounded connections, he caused electrical impulses to extend or stretch out, perhaps by means of magnetic lines of force, from a transmitting to a receiving station, and thus accomplished, for short distances, the feat of sending signals through the air without wires. These prior experiments are only relevant at this time as showing the use of batteries, telegraph keys, telephones, and circuit interrupters or breakers in wireless systems, and the discovery and disclosure, especially by Dolbear, of certain properties of electricity utilized by later inventors, and of the desirability of using elevated conductors.

The means for the later developments of wireless telegraphy were furnished in the proof by actual experiment of the correctness of certain theories promulgated by Prof. Maxwell, of Cambridge, in 1865, that electricity, like light, traversed space through the medium of ether, and that, if a spark be created by a disruptive discharge, it will spread out in waves or undulations. These waves are known as "Hertz waves" or "Hertz oscillations," from the name of their discoverer, Heinrich Hertz. He produced these waves by the use of an apparatus consisting of a radiator and a receiver equipped with rods having small metallic knobs on the ends, and separated a short distance from each other. This separation is the spark-gap, by means of which the Hertzian waves or oscillations are produced. When the transmitter or radiator is connected with a Ruhmkorff coil, or any source of high electric tension, such as an induction coil, with mechanical vibrator, or a producer of electric current, such as a dynamo, a charge of electricity is sent through the circuit which includes the spark-gap, and a spark passes across the spark-gap and creates the electrical vibration or wave called the "Hertz wave." The characteristics of these waves are explained by Dr. De Forest as follows:

"The radiations are through the ether, not the air. They are therefore independent of wind or weather, and can penetrate all substances which are not conductors. They speed outward from the transmitter, in ever widening circles, with the velocity of light. They skim over the surface of land and sea, and hence reach stations lying far below the horizon. When these waves strike an upright conductor a portion of their energy is cut out, and generates high frequency electric currents of minute power, which run down the antenna wire to earth in traversing the receiving detector. By common consent, then, such vibrations detached or traveling over a conducting surface have most appropriately been styled 'Hertzian waves.' Most certainly also are they 'oscillating currents' when traversing conductors. This was Hertz' demonstration. * * * But when an electrical system discharges, having so small a time constant that the pulsations occur at a rate of millions per second, we have very different conditions from those ordinarily classed with

alternating or oscillatory currents. * * * A large portion of the energy is electrostatic, and the force there involved may be conceived as lines of electric displacement perpendicular to the conducting surface, traveling along it away from the source of energy, following any zigzag path, rounding corners, reflected wholly or in part at all such sudden changes in shape or nature of the conductor."

Marconi has fully and accurately described the peculiarities of these oscillations as follows:

"The main character or feature of Hertzian waves is that they can be transmitted and received through space and through certain bodies, and that they follow the same laws which govern the propagation of light waves. They obey the laws of diffraction, reflection, and refraction, and, when following on an electrical conductor, produce certain electrical phenomena on or in the said conductor. They differ from ordinary electromagnetic induction in the fact that they become and are detached from the place or instrument of origin, and travel through space like light from a lamp or sound from a bell. Their speed is exceedingly great—in fact, the same as the speed of light; approximately 186,000 miles per second. They are thus similar to light waves, so far as they become detached from the radiator or producer, but possess the property, not possessed in the same degree by light waves, of traveling around obstacles or corners, such as mountains or the curvature of the earth, which curvature exists to such a large extent between any two positions situated, say, a thousand miles apart. Hertzian waves present the peculiarity of being reflected by electrical conductors and conducted by electrical insulators. Thus a sheet of glass or ebonite, which is called an electrical insulator, is transparent to Hertzian waves, and will let them through with perfect ease, whilst a sheet of metal or other conducting substance will reflect or absorb these waves. For this reason it is rather difficult to carry out tests or experiments concerning the propagation of electric waves or wireless telegraphy across rooms or halls, for the reason that these waves are reflected or absorbed in certain cases by the metallic fittings in the room, such as metal pipes or gilded paper or metallic picture frames, etc. Some of the special characteristics of these waves, which one encounters with them when experimenting in laboratories, tends rather to make it difficult to understand how they can be controlled with such certainty and regularity when applied for the purpose of transmitting reliable messages through space in the manner I have already explained in answer to the other questions. * * * In order that there may be radiation in the form of a Hertzian wave or true electric wave into space, the frequency of the electrical oscillations set up in the conductors must be so high as to be reckoned at least in hundreds of thousands, or perhaps, rather, millions, per second. An analogy of this is to be found in the case of a sound wave through air. In order that this air wave may be produced, and therefore the sound, some object must strike the air with a certain rapidity or frequency. Thus, for instance, the swinging of a bell in a church steeple to and fro through the air will produce no air waves, and therefore no sound; but, if the rim of the bell is struck suddenly with a hammer, the whole bell vibrates at the rate of some hundreds or thousands per second, and affects the air with suddenness to create an air wave or sound, which is the sound of the bell which we hear. Therefore, in the same way, if the conducting bodies are simply connected to the producer of ordinary alternating currents or high tension electricity, no Hertzian wave or any other wave is produced; but, if a spark is caused to pass to or from or off said conductors in a suitable manner, then at each discharge or at each spark Hertzian waves, which are oscillations of a frequency of millions or hundreds of thousands per second, are produced and radiated into space. Hence it appears absolutely clear to me that there is no Hertzian wave telegraphy without the essential feature for producing Hertzian waves, which is the Hertzian spark."

It thus appears that, so far as known, these waves are produced only by a disrupted electrical discharge across a spark-gap; that

these oscillations are characterized by some conditions similar to those of electric waves, and others peculiar to light waves; that they differ from the impulses of the prior art, in that, while those stretched out in horizontal lines from the transmitting source of energy to the receiver, these waves are detached from the point of production, and travel through or are propagated in the ether, and around, through, or over the surfaces of intervening objects. While, however, they pass through materials which operate as insulators for electric currents, and are arrested by conductors of electric currents, yet, when they once impinge upon a receiving wire, they exhibit in their conduct and the laws of their operation the manifestations of electrical currents of high frequency oscillations. The present systems of spark telegraphy owe their origin and practical commercial development to this great discovery by Hertz.

Marconi, referring to his apparatus, says:

"According to this invention, electrical signals, actions, or manifestations are transmitted [through the air, earth, or water] by means of oscillations of high frequency, such as have been called 'Hertz rays' or 'Hertz oscillations.' All line-wires may be dispensed with."

And referring to the prior art, he says:

"I am aware of the publication of Professor Lodge of 1894, at London, England, entitled 'The Work of Hertz,' and the description therein of various instruments in connection with manifestations of Hertz oscillations. I am also aware of the papers by Professor Popoff in the 'Proceedings of the Physical and Chemical Society of Russia' in 1895 or 1896. But in neither of these is there described a complete system or mechanism capable of artificially producing Hertz oscillations, and forming the same into and propagating them as definite signals, and capable of receiving and reproducing telegraphically such definite signals; nor has any system been described, to my knowledge, in which a Hertz oscillator at a transmitting station and an imperfect-contact instrument at a receiving station are both arranged with one terminal to earth and the other elevated or insulated; nor am I aware that prior to my invention any practical form of self-recovering imperfect-contact instrument has been described.

"I believe that I am the first to discover and use any practical means for effective telegraphic transmission and intelligible reception of signals produced by artificially formed Hertz oscillations."

These means comprise a transmitting and a receiving station equipped with signaling apparatus, which are shown by the following copies of figures 1 and 4 of the patent drawings:

Fig. 1.

Fig. 4.

The patentee says:

"Referring now to Fig. 1, a is a battery, and b an ordinary Morse key closing the circuit through the primary of a Ruhmkorff coil, c. The terminals, c', of the secondary circuit of the coil are connected to two metallic balls, d, d, fixed by heat or otherwise at the ends of tubes * * * of insulating material. * * * e, e, are similar balls fixed in the other ends of the tubes, d', * * * through which pass rods, d⁴, connecting the balls, d, to the conductors. One (or both) of the rods, d⁴, is connected to the ball, d, by a ball and socket joint, and has a screw head upon it working in a nut in the cover, d³. By turning the rod, therefore, the distance of the balls, e, apart can be adjusted. * * * The balls, d and e, are preferably of solid brass or copper, and the distance they should be apart depends on the quantity and electromotive force of the electricity employed; the effect increasing with the distance so long as the discharge passes freely. With a coil giving an ordinary eight-inch spark, the distance between e and e should, to assure good results, be from one twenty-fifth to one-thirtieth of an inch, and the distance between d and e about one and one-half inches. Other conditions being equal, the larger the balls the greater is the distance at which it is possible to communicate. I have generally used balls of solid brass of four inches diameter, giving oscillations of ten inches length of wave. If a very powerful source of electricity, giving a very long spark, be employed, it is preferable to divide the spark-gap between the central balls of the oscillator into several smaller gaps in series. This may be done by introducing between the big balls smaller ones of about half an inch diameter, held in position by ebonite frames."

A trembler-break and connections on the Ruhmkorff coil, c², c³, c⁴, breaking the direct current into an alternating current, is not involved herein. "In Fig. 4, g is the battery, and h a telegraphic instrument on the derived circuit of a relay, n." That is, this device comprises a battery circuit, which includes in its circuit an ordinary tape recording telegraph instrument, and the vertical pin of a sensitive relay—a circuit opener and closer—and which has only slight capacity for the production of an induced current. j is a circuit-closer or coherer, upon the effectiveness of which the whole operation of the system depends. It consists of a glass tube about 1½ inches long and one-tenth of an inch in diameter, containing a column of loose metallic powder, consisting of nickel and hard silver filings, with or without mercury. The column is connected at each end to a metallic plate, k, "of suitable length to cause the system to resonate electrically in unison with the electrical oscillations transmitted." Between the powder and plate are tight-fitting pieces of silver wire joined to pieces of platinum wire, and the tube is closed and sealed on the platinum wires. The patentee states that "the tube, j, may be replaced by other forms of imperfect electrical contacts." The plates, k, are "preferably of such a length as to be electrically tuned with the electric oscillations transmitted." These plates communicate with the local circuit through two very small "choking-coils," k'. "The object of these choking-coils is to prevent the high-frequency oscillation induced across these plates by the transmitter from dissipating itself by running along the local-battery wires, which might weaken its effect on the sensitive tube, j." s, h', p', and p² are resistances. On the circuit actuated by the relay is the battery, r, and the trembler, p, which is constructed and operates like the arm of an electric bell to automatically tap the powder in the tube; such tapping being produced by means of

the current passing through the tube. The operation of the tube and its connections is thus explained by the patentee:

"When no oscillations are sent from the transmitting station, the tube, j, does not conduct the current, and the local-battery circuit is broken; but, when the powder or tube is influenced by the electrical oscillations from the transmitter, it conducts and closes the circuit. I find, however, that when once started the powder in the tube continues to conduct even when the oscillations from the transmitter have ceased; but, if it be shaken or tapped, the circuit is broken. A tube well prepared will instantly interrupt the current passing through it at the slightest tap, provided it is inserted in a circuit in which there is little self-induction and small electromotive force."

That is, the powder in the tube, j, when in its normal condition, offers such an amount of resistance that the local-battery current will not pass through it. But when the high-frequency oscillations or waves fall upon it, and surge up and down the elevated conductors, they effect such a transposition in the arrangement of the grains of powder, in a manner not entirely understood, as to weld them together, as it were, the result of which is that the grains resolve themselves into conductive paths, and the current passing through them attracts the vertical arm of the relay, n, which, contacting with the two points below n, permits the current to pass around through the battery, r, to the telegraph instrument, h, which records the dash or dot as transmitted and received from the transmitting station. In order to prepare the powder in the tube for the transmission of another signal, the filling must be shaken back into its nonconducting state. This is accomplished by the trembler, p, which taps the tube, and causes the grains of powder to separate and return to their normal state of high resistance.

The operation of the system and apparatus in communicating signals is described by the patentee as follows:

"The Ruhmkorff coil or other source of high tension electricity capable of producing Hertz oscillations being in circuit with a signaling instrument, such as a Morse key, for instance, the operator, by closing the circuit in the way commonly employed for producing dots and dashes in ordinary telegraphy, will cause the oscillator to produce either a short or more prolonged electric discharge or spark or succession of sparks, and this will cause a corresponding short or more prolonged oscillation in the surrounding medium, corresponding in duration to the short or longer electrical impulse which in ordinary telegraphy produces a dot or dash. Such oscillations of defined character will thereupon be propagated as such throughout the medium, and will affect a properly constructed instrument at a distant receiving station. At such station the imperfect-contact instrument is in circuit with a relay, and, when oscillations from the transmitting station reach and act upon such imperfect-contact, its resistance is reduced, and the circuit is thereby closed during the continuance of the oscillation, and for a length of time corresponding thereto. The closing of the relay-circuit causes the sounder or other signal apparatus to act in accordance with the particular oscillation received, and the oscillation also immediately starts the action of the shaking or tapping device, which so shakes the powder in the imperfect-contact instrument as to cause it to break circuit as soon as the oscillation ceases which has closed the circuit and produced a movement of the signaling instrument corresponding thereto. I am therefore enabled to communicate signals telegraphically without wires by thus artificially forming oscillations at the transmitting station into definite signals by means of a signaling instrument, and receiving and reading the same at a receiving station by an imperfect-contact instrument, which, when acted upon by such defined oscillations, oper-

ates, first, to close the circuit in accordance with the received oscillation, and produce a corresponding movement of the receiving instrument, relay, or sounder; and also to operate a shaking device to automatically reopen the circuit immediately after the reception of each oscillation, thereby preserving the results of its defined character in the action of the receiver. All the details specified herein of construction of the sensitive tube and its connections are desirable for great efficiency, but the fundamental features of my system of transmission are not restricted to such details."

Other portions of the specifications and other drawings describe and illustrate other transmitters and receivers for long-distance service, comprising metallic plates elevated from the earth by means of insulating suspenders. These features will be considered in connection with the discussion of the issue of infringement.

The claims in suit are the following:

"(1) In an apparatus for communicating electrical signals by means of a producer of Hertz oscillations, and a signaling instrument, the combination, in the receiver, of an imperfect electrical contact, a circuit through the contact, and a receiving instrument, operated by the influence of such oscillations on said contact, substantially as and for the purpose described. * * *

"(3) The combination, in an apparatus for communicating electrical signals, of a spark-producer at the transmitting station, an earth connection to one end of the spark-producer, an insulated conductor connected to the other end, an imperfect electrical contact at the receiving station, an earth connection to one end of the contact, an insulated conductor connected to the other end, and a circuit through the contact, substantially as and for the purpose described. * * *

"(5) The combination, in an apparatus for communicating electrical signals, of a spark-producer at the transmitting station, an earth connection to one end of the spark-producer, an insulated conductor connected to the other end, an imperfect electrical contact at the receiving station, choking-coils connected to each end of the contact, an earth connection to one end of the imperfect contact, an insulated conductor connected to the other end, and a circuit through the coils and contact, substantially as and for the purpose described. * * *

"(8) The combination, in an apparatus for communicating electrical signals, of a spark-producer at the transmitting station, an earth connection to one end of the spark-producer, an insulated conductor connected to the other end, a tube containing metallic powder at the receiving station, an earth connection to the powder, and an insulated conductor also connected therewith, and a circuit through the powder, substantially as and for the purpose described. * * *

"(10) The combination, in an apparatus for communicating electrical signals, of a spark-producer at the transmitting station, an earth connection to one end of the spark-producer, an insulated conductor connected to the other end, a tube containing metallic powder at the receiving station, choking-coils connected to the powder, an earth connection to the powder, and an insulated conductor also connected therewith, and a circuit through the coils and powder, substantially as and for the purpose described. * * *

"(24) The combination of a transmitter capable of producing electrical oscillations or rays of definite character at the will of the operator, and a receiver located at a distance and having a conductor tuned to respond to such oscillations, a variable-resistance medium in circuit with the conductor, whose resistance is altered by the received oscillations, means, controlled by the received oscillations, for restoring the resistance medium to its normal condition after the reception of such oscillations, and means for rendering the received oscillations manifest."

The specific infringement complained of consists in the installation and use by defendant of its stations between New York City and Staten Island. The construction of its apparatus is shown by

the Bradfield diagram.   Its system, known as the "De Forest System," takes its name from Dr. Lee De Forest, who is prominently identified with the history of wireless telegraphy, and who, in connection with E. H. Smythe, has obtained several patents for various improvements in the wireless or spark telegraph art.   The De Forest apparatus comprises transmitting and receiving stations equipped with high vertical wires, insulated at the top.   At the transmitting station are a dynamo, directly producing an alternating current, primary and secondary coils, a Morse telegraph key, a spark-gap, and a condenser—a most valuable adjunct to the practical operation of wireless telegraphy, but not directly involved in this suit.   The high-frequency oscillations created or produced as in the Marconi system are radiated from the vertical wires of the transmitter, and, traveling across to the receiver, impinge upon its wires and travel down to a so-called detector or variable-resistance conductor, closely corresponding in function and result to the coherer of the patent in suit, and claimed to be its equivalent.   The normal condition of the receiving apparatus and its subsequent operation are thus described in patent No. 716,203, granted December 16, 1902, to De Forest and Smythe:

"Under ordinary conditions when the receiving apparatus thus shown and described is not in operation the current generated by the local battery passes through the circuit including the signaling device, the choke-coils, and the variable-resistance conductor; no material resistance to the passage of the current being offered by the choke-coils or by the variable-resistance conductor, the resistance of which under such conditions is at its lowest limit.   Upon the receipt of an electric impulse through the aerial conductor the resistance of the choke-coils to the passage of the wave forces it to pass by way of the ground connection, E, to the ground, and thus insures its passage through the variable-resistance conductor.   The passage of the wave through the conductor greatly increases its resistance, and, since the variable-resistance conductor is in the local circuit, this change of resistance is indicated by the telephone or other signaling device, which is also in the local circuit.   Our use of the variable-resistance conductor having the construction shown and described has been sufficient to demonstrate not only its extreme sensitiveness, but also its remarkable rapidity of action.   The variation of resistance of the conductor due to the passage of successive electric impulses is plainly marked, no matter how rapidly the impulses may succeed each other, and in fact the only limit to the distinct indication of the passage of successive impulses is the recording capacity of the signaling device, or the capacity of the senses for distinguishing separate signals.   This capacity for rapid repetition of the variation of resistance in the conductor is a consequence, as well as a demonstration, of the fact that the passage of the electrical impulse through the liquid interposed between the electrodes produces no change of conditions therein, except such as is instantaneously and automatically counteracted; the conductor being thus restored to its condition of normal resistance immediately after the passage of each impulse.   This rapidity of action of the variable-resistance conductor is of great practical importance, for the reason that it makes it possible to distinguish perfectly between impulses generated with predetermined frequency at a transmitting station and other electrical impulses following each other at a different rate.   This apparatus operates equally well, therefore, under varying electrical conditions, its action being perfect in the presence of atmospheric electric disturbances, in the sense that the impulses from a transmitting-station have a uniform frequency of impulse, whereby they may be readily distinguished from other and accidental impulses.   In fact the signaling device may be placed in a suitably tuned circuit, and may be thus made to respond auto-

matically to similarly tuned impulses, and to no others; the signaling device being thus made to automatically select impulses transmitted at a predetermined frequency."

The material differences between the De Forest system and that of the Marconi patent, barring the questions relating to elevated conductors, are found in the different construction and operation of the receiving device. The De Forest detector or electrolytic receiver comprises a glass tube containing two metal pins or electrodes extending into the tube, between which is placed an electrolytic paste, consisting of various chemicals, constituting a fluid mixture. In this condition the resistance of the device is so slight that current from the local battery applied to the electrodes passes through this mixture, and, by what is known as electrolytic action, decomposes it so that it becomes a conductor, and the resistance of the device is practically eliminated, as explained in the portion of the specification of patent No. 716,203, quoted above. When the Hertzian oscillation traverses the detector or receiver, the additional current passing through the minute particles in the paste causes a generation of gas bubbles therein, which break up and separate the conducting particles, and so increase their resistance that the battery circuit is broken, and the breaks are transmitted to the telephone, and manifested in the form of a series of clicks. The Marconi apparatus transmits the dots and dashes to its recording telegraph instrument by opening a normally closed local battery circuit; the De Forest transmits its sounds by the closing of a normally open battery circuit. But the defendant does not rely upon this reversal of current operations alone to support its claim of noninfringement, but upon other differences in the light of the prior art, to be hereafter considered.

Certain of the claims in suit, namely, claims 5 and 10, cover "choking-coils." The patentee describes them as "formed by winding a few inches of very thin and insulated copper wire around a bit of iron wire." Their essential function, as stated by the patentee, is to prevent the shunting or dissipation of the high-frequency oscillations. Complainant claims that defendant's resistances, c and r, in the receiving station are the equivalent and an infringement of the choking-coils of the patent. Defendant's resistances consist of coils wound on wooden spools. Defendant argues that their sole function is to reduce the flow of the battery circuit through the very sensitive chemical. Dr. De Forest testifies, as the result of certain experiments conducted by him, that he does not think they have any tendency to act in a choking capacity. He also testified as follows:

"Q. 27. Do these resistances act as choking coils for the received oscillations? A. The normal resistance of the receiver is so small that choking coils in the circuit are unnecessary, there being no tendency of the Hertzian oscillation to seek the shunt path around the receiver in preference to going through the receiver direct. * * * XQ. 123. Referring to Complainant's Exhibit Bradfield Diagram, do the resistances, r and C, correspond in function and mode of operation with the resistances, C, C', shown in the drawing of De Forest and Smythe patents, 716,000 and 716,334? A. They perform the same function."

In said patents the resistance coils are referred to as self-induction or choke-coils. And in the specification of patent No. 716,000 the following passage is found:

"To cause the electrical oscillations generated in the aerial receiving-conductor, as far as possible, to traverse only the part of the local circuit containing the responsive device, self-induction or choke-coils are included in that part of the local circuit which would otherwise shunt the responsive device with respect to the received oscillations."

The experts for complainant agree that these resistances act, to a certain extent, at least, as choking-coils, and give their reasons for such agreement. The fact that they also diminish the flow of the battery circuit merely shows that they perform both functions. In these circumstances, the weight of evidence, based upon the expert testimony and Dr. De Forest's admissions and the statements in his patents, is sufficient to establish infringement of the choking-coils of the patent.

This question of infringement has been discussed here because its disposition does not require a consideration of the prior art. The condenser of defendant's apparatus, which stimulates or increases the effectiveness of the spark and its resultant oscillations, is not involved in this suit, and will not be discussed. The disposition of the other questions of infringement requires an examination of the history of the prior art.

Several of the claims cover the insulated conductors used when transmitting across long distances. In his specification, Marconi describes them as metallic plates suspended by wires on poles. He further says:

"When transmitting with connections to the earth or water, I use a transmitter as shown in Fig. 10. I connect one of the spheres, d, to earth, E, preferably by thick wire, and the other to a plate or elevated conductor, u, carried by a pole, v, and insulated from earth, or the spheres, d, may be omitted, and one of the spheres, e, be connected to earth, and the other to the plate or conductor, u. At the receiving station, Fig. 11, I connect one terminal of the sensitive tube, j, to earth, E, also by a thick wire, and the other to a plate or elevated conductor, 2, preferably similar to u. The plate, w, may be suspended on a pole, x, and must be insulated from earth. The larger the plates of the receiver and transmitter, and the higher from the earth the plates are carried, the greater is the distance at which it is possible to communicate. When using the last-described apparatus, it is not necessary to have the two instruments in view of each other, as it is of no consequence if they are separated by mountains or other obstacles. At the receiver it is possible to pick up the oscillations from the earth or water without having the plate, w. This may be done by connecting the terminals of the sensitive tube, j, to two earths preferably at a certain distance from each other, and in a line with the direction from which the oscillations are coming."

He suggests the use of balloons or kites instead of poles to carry the plates, or to serve as conductors instead of plates by being covered with tin foil. The defendant does not use plates. It employs at both stations elevated vertical wires as conductors, which are insulated from the earth at the top, but are not insulated from the earth at the other end.

Prof. Dolbear in 1882 applied for a patent, which issued in 1886 as No. 350,299, for a mode of electric communication without wires,

and in 1886 he published in the Scientific American a description of his system and of its operation. For reasons hereafter to be stated, it would serve no useful purpose to enter into the details of his patented apparatus. It comprised transmitting and receiving instruments connected with the ground, equipped with a battery, induction coil, and telephones. He used in his experiments a Morse key and vertical elevated wires, and capacity conductors or gilt kites, and states that communication by this method is practical to a distance of more than half a mile. The statement that he operated successfully over a distance of 13 miles appears to be mere hearsay. The defenses to the Dolbear patent, that it is inoperative, and that, even if operative, it operates by virtue of radically different electrical laws and phenomena, are both sustained. The Hertz waves had not then been discovered; the principle applied was apparently that of electrostatic induction, already explained, although the operation was claimed by Dolbear to depend upon impracticable differences and variations of potential between the stations. The consequent method of transmission, so far as this record shows, was the old one of electrical lines of force stretching out from one station to the other, as contrasted with that of the Hertz detached oscillations, which principle or mode of operation was necessarily limited to short distances. It used neither spark-gap, imperfect contact, nor coherer. Dolbear, however, does suggest the use of an induction coil with an automatic break, with which he says he produced louder and better effects; and it is possible that by this apparatus he may have produced, without knowing it, oscillations similar to those afterwards discovered and developed by Hertz. The evidence introduced to prove that apparatus constructed in accordance with Dolbear's disclosures has been successfully operated is utterly insufficient, because, inter alia, it rests upon the testimony of a single witness, Shoemaker, except in the case of the Galilee test; because the apparatus used differed essentially from that described in the Dolbear patent; and because, on the only occasion when a test was made in the presence of representatives of complainant—the last Galilee test—it was a failure. Edison patent, No. 465,971, for a wireless system, applied for in 1885, granted in 1891, and purchased by complainant after this suit was brought, and the Kitsee patent, No. 550,510, described the desirability of elevated induction capacity plates or devices, carried on poles or the masts of ships, or on balloons connected with the earth. The defenses to Dolbear, considered above, apply to these patents.

This discussion brings us down to the state of the art in 1894. It may be assumed that prior to that date no practical device had been produced by any system, and no means had been discovered for utilizing the 1887 Hertz waves in transmitting signals. In 1892 Prof. William Crooke had published an article showing the position of the scientific world in this matter, in which he says as follows:

"Whether vibrations of the ether, longer than those which affect us as light, may not be constantly at work around us, we have until lately never seriously inquired. But the researches of Lodge in England and of Hertz

in Germany give us an almost infinite range of ethereal vibrations or electrical rays, from wave-lengths of thousands of miles down to a few feet. Here is unfolded to us a new and astonishing world—one which it is hard to conceive should contain no possibilities of transmitting and receiving intelligence. Rays of light will not pierce through a wall, nor, as we know only too well, through a London fog. But the electrical vibrations of a yard or more in wave-length of which I have spoken will easily pierce such mediums, which to them will be transparent. Here, then, is revealed the bewildering possibility of telegraphy without wires, posts, cables, or any of our present costly appliances. Granted a few reasonable postulates, the whole thing comes well within the realms of possible fulfillment. At the present time experimentalists are able to generate electrical waves of any desired wave-length from a few feet upwards, and to keep up a succession of such waves, radiating into space in all directions. It is possible, too, with some of these rays, if not with all, to refract them through suitably-shaped bodies acting as lenses, and so direct a sheaf of rays in any given direction; enormous lens-shaped masses of pitch and similar bodies have been used for this purpose. Also an experimentalist at a distance can receive some, if not all, of these rays on a properly constituted instrument, and, by concerted signals, messages in the Morse code can thus pass from one operator to another. What, therefore, remains to be discovered is, firstly, simpler and more certain means of generating electrical rays of any desired wave-length, from the shortest, say of a few feet in length, which will easily pass through buildings and fogs, to those long waves, whose lengths are measured by tens, hundreds, and thousands of miles; secondly, more delicate receivers, which will respond to wave-lengths between certain defined limits, and be silent to all others; thirdly, means of darting the sheaf of rays in any desired direction, whether by lenses or reflectors, by the help of which the sensitiveness of the receiver (apparently the most difficult of the problems to be solved) would not need to be so delicate as when the rays to be picked up are simply radiating into space in all directions, and fading away according to the law of inverse squares. Any two friends living within the radius of sensibility of their receiving instruments, having first decided on their special wave-length and attuned their respective instruments to mutual receptivity, could thus communicate as long and as often as they pleased by timing the impulses to produce long and short intervals on the ordinary Morse code. * * * This is no mere dream of a visionary philosopher. All the requisites needed to bring it within the grasp of daily life are well within the possibilities of discovery, and are so reasonable and so clearly in the path of researches which are now being actively prosecuted in every capital of Europe that we may any day expect to hear that they have emerged from the realms of speculation into those of sober fact. Even now, indeed, telegraphing without wires is possible within a restricted radius of a few hundred yards, and some years ago I assisted at experiments where messages were transmitted from one part of a house to another without an intervening wire by almost the identical means here described."

In June, 1894, Prof. Lodge published a lecture entitled "The Work of Hertz," which has a most important bearing on the issues herein. In it he describes the Hertz researches and the character and operation of the waves, and states various problems involved in their radiation and absorption. He says: "The two conditions —conspicuous energy of radiation and persistent vibration electrically produced—are at present incompatible." He discusses the different methods employed in detecting electrical radiation; describes what he calls a "coherer"; says that "a tube of filings, being a series of bad contacts, works on the same plan"; states that, when an electrical surging occurs, the film breaks down, more molecules get within each other's range, and the momentary electric quiver acts as a flux or electric welding. He then explains the use of tappings to restore the contact to its original high-resistance

sensitive condition, and observes that this breaking down of cohesion by mechanical tremor is an ancient process, giving illustrations. He says:

"When working with the radiating sphere at a distance of forty yards out of [my] window, I could not, for this reason, shout to my assistant, to cause him to press the key of the coil and make a spark, but I showed him a duster instead; this being a silent signal, which had no disturbing effect on the coherer or tube of filings. I mention 40 yards, because that was one of the first outdoor experiments, but I should think that something more like half a mile was nearer the limit of sensitiveness. However, this is a rash statement, not at present verified."

In January, 1896, Popoff published an article at St. Petersburg, in which he refers to the reproduction of Lodge's experiments, and says:

"The result was that I arrived at the construction of an apparatus serving for objective observations of electrical vibrations useful both for lecturing purposes and for registration of the electrical perturbations which take place in the atmosphere."

He discusses the coherer, previously disclosed by Branley, and his modifications thereof, and states that to shake the tube with filings he uses a telegraph relay and ordinary bell, both for disclosing the action of electric vibrations upon the filings and for the destruction of conductivity. He then illustrates and describes the apparatus used by him, including choking-coils, a coherer filled with metal filings, and a tapper operating both to de-cohere the particles in the coherer and to sound the bell so as to produce signals, and short vertical wires, 2 to 5 meters in length. The assertion that he used in this apparatus earth connections and high vertical aerial wires, so far as it is based on Popoff's affidavit, is not sufficiently supported by proof. Popoff, however, says:

"The apparatus possessing such sensitiveness may serve for different lecture experiments with electric vibrations, and, being furnished with a metallic cover, may be conveniently adapted for experiments with electric rays. * * * Another application of this apparatus, which may give more interesting results, will be its capacity to record electric vibrations which take place in the conductor connected with the point A or B (see schematic drawing) in the case when the conductor is subjected to the action of electromagnetic perturbations arising in the atmosphere. For this purpose it is sufficient to connect the apparatus, protected from other actions, with an aerial conductor placed afar from telegraphs and telephones, or else with the core of the lightning rod. * * * Upon the building of the Institute, among other adjustments appointed for observation of the direction and force of the wind, there was placed a small wooden mast, which overtopped by about 4 sajen (7 feet) the fixtures of the anemometers and weathercocks, and which was furnished at the top with an ordinary ferrule of the lightning rod. This ferrule, by means of a wire carried first on the wood of the mast, and further stretched across the yard on the insulators into the meteorological cabinet, was connected with the apparatus at point A; the point B was connected to the conductor common with other meteorological apparatuses, leading into the ground by means of the water work net."

This apparatus was apparently used to register the force and direction of the wind and the vibrations of thunderstorms.

Popoff concludes his article as follows:

"On the ground of the results obtained at the above-described experiments, it is desirable that the persons interested in observations concerning thunder-

storms should subject the apparatus to more continuous and careful observations. In conclusion, I can express the hope that my apparatus, with further improvements of same, may be adapted to the transmission of signals at a distance by the aid of quick electric vibrations, as soon as the source of such vibrations, possessing sufficient energy, will be found."

Harry Shoemaker testifies that in April, 1895, when he was a boy of 16, he constructed and used a complete system of wireless telegraphy, which, as now described, is a complete anticipation of the patent in suit. His testimony is so utterly unsupported and insufficient and improbable that it will not be discussed.

Marconi testifies that in 1895 he constructed apparatus by which intelligible messages were successfully transmitted and received up to a distance of two miles. In this discussion, however, in the absence of satisfactory corroboration of said testimony, the date of invention will be considered as that of the filing of the British patent, June 2, 1896. The application for the original of the reissued patent in suit was filed December 7, 1896. In February, 1896, Marconi arrived in England, and made tests in the summer and autumn at the invitation of the government in the presence of its representatives. He testifies that in these tests he used elevated wires, with and without plates and earth connections, and that he was able to obtain signals on his Morse recorder up to 1¾ miles, to the satisfaction of the Government's representatives. The success of the apparatus is evidenced by the statements made in a lecture delivered by Sir William Preece, the Engineer in Chief of the British Post Office. Marconi testifies that in March, 1897, with similar apparatus, he carried out further tests at Salisbury Plain before the representatives of the government, extending the distance to 6 or 7 miles, in May to 9 miles, and in September to 10 miles. In 1898 a distance of 35 miles was attained, and the system was commercially applied by the Dublin Daily Express to report the Kingston yacht races. The distance of communication was continuously increased until in 1901 a signal was sent from the Poldhu station in Cornwall, England, to Signal Hill, near St. Johns, Newfoundland. Later, messages were successfully sent between this country and England.

If now we examine the patent in suit in the light of this discussion, we shall find that every element of the claims in suit is taken from the prior art. The signaling and receiving instruments are common to the various apparatus from Dolbear, in 1882, to Popoff, in 1895; the Morse key is specifically referred to by Dolbear, Edison, and Kitsee, and is suggested by Lodge; the spark-gap, invented by Hertz for producing the Hertz oscillations, is found in Lodge and Popoff; the 1891 Branley coherer or "imperfect electrical contact," comprising a tube with filings, and its operation by means of a tapper, are elaborately explained in Lodge's lecture, and utilized by Popoff in his experiments; and "choking-coils" are illustrated and described by Popoff. The "insulated conductors," described and shown as comprising elevated plates suspended on wires, were shown in Dolbear, Edison, and Kitsee. It further appears that Marconi's apparatus at first worked imperfectly, and that up to 1898

or 1899, when he introduced various improvements, some of which involved radical changes, he failed to establish communication for greater distances at most than 30 or 40 miles.

Counsel for defendant argues that said prior disclosures, imperfect operation, and subsequent improvements and their effect, deprive the original patent of all claim of novelty, except for "specific improvements on various parts of prior existing complete systems." That this contention is not well founded, but that the foregoing facts serve to support the claim of the exercise of a high degree of inventive ability, is apparent from a consideration of the record. No prior existing system was complete, or had been shown or conceived to be commercially operative. The Dolbear tests, conducted by defendant's experts, were a failure. Lodge thought he might signal half a mile, but he afterwards made the following admission:

"Although the method of signaling to a moderate distance through walls or other nonconducting obstructions by means of Hertz waves emitted from one station, and detected by Branley filing tubes at another station, was practiced by the author and by several other persons in this country, it was not applied by them to actual telegraphy. The idea of replacing a galvanometer, which was preferably a well-damped or speaking galvanometer, by a relay working an ordinary sounder or Morse, was an obvious one; but, so far as the present author was concerned, he did not realize that there would be any particular practical advantage in thus with difficulty telegraphing across space, instead of with ease by the highly developed and simple telegraphic and telephonic methods rendered possible by the use of a connecting wire. In this nonperception of the practical uses of wireless telegraphy he undoubtedly erred."

He describes Marconi's successful development of his system, deplores the uncertainty of the operation of the coherer at times, and adds as follows:

"Let us hope that these latter times will become less frequent, and that the whole thing will become quite dependable before long. The pertinacious way in which Mr. Marconi and his able co-operators have, at great expense, gradually worked the method up from its early difficult and capricious stage to its present great distances and comparative dependableness, is worthy of all praise."

As complainant's expert Flemming says:

"In this lecture Lodge describes the principal discoveries of Hertz, and his epoch-making investigations on the mode of production in the ether of what are now called 'Hertzian waves.' Lodge also described some of his own investigations, and the manner in which an imperfect contact of two metals, which is now called a 'coherer,' is sensitive to these electric waves. The chief object of the lecturer was to demonstrate the production of Hertzian waves in space, and to show that these waves could be reflected and refracted like rays of light. There is not in the lecture the smallest suggestion that these Hertzian waves could be applied for the purposes of telegraphy or the transmission of intelligible signals, nor that the Hertz oscillator or the Branley or Lodge coherers could be used as telegraphic instruments, or that the coherer could be used as an extremely sensitive relay to set in operation some telegraphic instrument."

Although Prof. Lodge is alive, he has not been called by defendant to sustain its contentions as to the scope of his disclosures.

The Popoff publications disclosed the first experimental antici-

pations of a wireless system afterwards. successfully developed. They disclosed the construction and practical operation of a coherer in a receiver such as was covered by the original Marconi patent. That they did not disclose a practical wireless telegraphic system has been proved by the limitations in Popoff's description already discussed, by his vague statement of the hope that his apparatus, "with further improvements, might be adapted to the transmission of signals when a sufficiently energetic source of quick electric vibrations should be found," and by the failure of defendant to introduce any evidence on the part of Popoff to support the extravagant claims now asserted as to the broad scope of his invention as an anticipation.

It is true that Marconi, prior to 1898, was only enabled to transmit signals for a few miles. But in the Telephone Cases, 126 U. S. 1, 535, 8 Sup. Ct. 778, 782, 31 L. Ed. 863, the Supreme Court said:

"It is quite true that when Bell applied for his patent he had never actually transmitted telegraphically spoken words so that they could be distinctly heard and understood at the receiving end of his line, but in his specification he did describe accurately and with admirable clearness his process —that is to say, the exact electrical condition that must be created to accomplish his purpose—and he also described, with sufficient precision to enable one of ordinary skill in such matters to make it, a form of apparatus which, if used in the way pointed out, would produce the required effect, receive the words, and carry them to and deliver them at the appointed place."

It would seem, therefore, to be a sufficient answer to the attempts to belittle Marconi's great invention that, with the whole scientific world awakened by the disclosures of Hertz in 1887 to the new and undeveloped possibilities of electric waves, nine years elapsed without a single practical or commercially successful result, and that Marconi was the first to describe and the first to achieve the transmission of definite intelligible signals by means of the Hertzian waves.

The exact contribution of Marconi to the art of spark telegraphy may be stated as follows: Maxwell and Crookes promulgated the theory of electrical oscillations by means of a disruptive discharge. Hertz produced these oscillations, and described their characteristics. Lodge and Popoff devised apparatus limited to lecture or local experiments, or to such impracticable purposes as the observation of thunderstorms. Marconi discovered the possibility of making these disclosures available by transforming these oscillations into definite signals, and, availing himself of the means then at hand, combined the abandoned and laboratory apparatus, and, by successive experiments, reorganized and adapted and developed them into a complete system, capable of commercially utilizing his discovery.

This review of the prior art discloses what the public already had, what it still required, what the patentee sought to accomplish, what was the measure of his success, and what was the character of the means by which it was achieved. If it appears that the public has only received from a patentee such improvement in means or result as it might have procured by presenting its wants to a skillful me-

138 F.—43

chanic, provided with the appropriate appliances and knowledge, then there is no reason why such patentee should be permitted to demand a monopoly as the price of a construction which would naturally have been disclosed in the ordinary development of the art. But if the results of the skill of the mechanic or the ingenuity of prior inventors still leave the barrier of impracticability between the end sought and the result attained, an interval between theory and practice, a limitation upon further development, while a later inventor, by the exercise of a discriminating faculty, detects and distinguishes the difficulties, and estimates their proportions, and breaks down the barrier, or bridges the interval, or stretches beyond the limitation, by an instrumentality which, in the very facts of its construction and operation, and by the adaptation of its mechanism to the end sought, suggests original and creative design, then, by his contribution of the essential idea in tangible shape, he has invented a new instrumentality, and his monopoly should be sustained. It has been well said that there is no affirmative test of invention. But if there be one test which more than others is helpful in adjusting the sense of perspective, and in promoting a realization of due relation between mechanical skill and invention, it is to be found in the appreciation of unexpected possibilities of adaptations to meet exigent demands which result in successful operation and effect. Other inventors, venturing forth on the sea of electrical movement, met the rising tide of the Hertzian waves, and allowed them to roll by, without appreciating that this new current was destined to carry onward the freight and traffic of the world of commerce. They noted their manifestations, suspected their possibilities, disclosed their characteristics, and hesitated, fearing the breakers ahead; imagining barriers of impracticable channels and shifting sand bars. Marconi, daring to hoist his sail and explore the unknown current, first disclosed the new highway.

It is argued that Marconi's subsequent improvements, made in 1898, whereby he achieved more substantial success, were borrowed from others, and are such a wide departure from the original invention as to constitute an abandonment. These changes consist in the elimination of the suspended plates, leaving the vertical wires to act as conductors, the connection of said wires with the earth at the lower end through transformers, and the addition of a condenser. The "insulated conductors" of the patent in suit are described and illustrated as metallic plates suspended by poles on wires, and insulated from earth. The conductors of the 1898 system are aerial wires insulated at the top, but connected to earth at the bottom.

Marconi, in his Society of Arts lecture, says as follows:

"The new methods of connection which I adopted in 1898—i. e., connecting the receiving aerial directly to earth instead of to the coherer, and by the introduction of a proper form of oscillation transformer in conjunction with a condenser so as to form a resonator tuned to respond best to waves given out by a given length of aerial wire, were important steps in the right direction."

And referring to these changes, he quotes from a later patent as follows:

"According to this invention the conductor (aerial) is no longer insulated, but is connected to earth through the primary of an induction coil, whilst the ends of the imperfect contact (or coherer) are connected to the ends of the secondary one of the connections passing through a condenser."

Great stress is laid by defendant upon these statements. In view of this change in insulation, it is forcibly argued that, even if it be assumed that Marconi made a great invention, which entitled him to a wide range of equivalents, he is confined to what he discovers or invents and describes, and he cannot prevent others from using means substantially different from what he has described. O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601. And it is argued that the new construction is so revolutionary in character, depending for its successful commercial operation upon new inventions of others appropriated by Marconi, and upon the abandonment of old constructions originally claimed to be essential, that it cannot be held to be the invention of the patent in suit. It is claimed that the following facts are admitted or proved: That Marconi, by the term "insulated conductors," meant insulated at both ends from the earth; that conductors, not insulated from, but connected to, earth, were old; that Lodge suggested and Braun originated the transformer in connection with a condenser; and that the present system depends for its commercial success upon the 1898 departures.

The proposition of defendant may be thus stated: The defendant is entitled to the use of the appliances of the prior art, including therein the elevated wires, for example, of Popoff, connected to earth. It has the right to substitute in the old apparatus the spark-gap for the production of Hertz waves, and thus to transmit signals by means of old electrical devices, including the old Morse key. It is argued, therefore, that the Marconi invention disclosed a spark telegraphy system limited, as to conductors, to means consisting of elevated metallic plates—the larger and higher and further removed from each other the better—necessarily disconnected from the earth at bottom, in order to confine the oscillations to the plates acting as capacities and radiators, and that as defendant discards these disclosures, and substitutes for metallic plates suspended on wires and insulated at both ends naked aerial wires insulated at the top, but with earth connections at bottom, as their capacities and radiators, it does not infringe the claims covering the conductors of the patent. The answer of complainant to these arguments is as follows: The whole contention, confining the term "insulated" to absolute insulation at the bottom of the conductor, is based on a careless expression used by Marconi in his lecture in 1901 replying to certain criticisms of his invention. That it is a mere afterthought of counsel is shown by the fact that it is not referred to by defendant's witnesses in their examination. That it is immaterial whether the conductor is or is not insulated appears from Dr. De Forest's admission. That it is not well founded is proved by the patent in suit and by Marconi's subsequent patent. That Marconi did not

intend by the use of the word "insulated" to insist upon complete insulation at both ends of the wire, but only on such a degree of insulation as was necessary to effect the best results, appears from the failure of defendant's witnesses to so interpret the patent, and from the construction shown in the patent. In the original of the reissue, Marconi says that one of the balls of the spark-gap is connected to earth, and the other to a plate or conductor suspended on a pole, v, and insulated from earth, and that one terminal of the coherer is connected to earth, and the other to a plate or conductor, which may be suspended on a pole, and must be insulated from earth. The specification and drawings show that the insulation meant by the patentee is absolute insulation at the top, and such obstruction or insulation as is afforded by the spark-gap and filings tube. The elevated conductors, thus described as insulated, are absolutely insulated from earth at the top. The transmitting conductor is separated or obstructed from earth at the bottom by the spark-gap, across which, however, the current must pass to create the Hertz oscillations. The receiving conductor at the bottom is insulated when not in operation, because the local current cannot pass through the coherer. But the moment that the oscillations strike the tube and weld the powder into a conductor for the current, the elevated conductor is no longer insulated from earth at the bottom, because the current passes through the other end of the tube, which is connected to earth, and establishes connection with the earth. In neither case is the conductor operatively insulated from earth at the lower end, because the Hertzian oscillations leap across the spark-gap and pass through the tube whenever the circuit is closed and the apparatus is in operation. When, therefore, the patentee spoke of insulation, he meant the insulation described and illustrated by him—the effective insulation at the top, the physical insulation at the bottom, when the apparatus was not operating; and he showed that, when in operation, the conductor was not practically insulated, but was connected to earth, because the oscillations therein surging down passed to the earth across the spark-gap and through the coherer, respectively. In the improved construction the insulation at the top is unchanged, but in place of the connection to the spark-gap and coherer, the physical insulators, the conductor is connected to a transformer, which operates merely as an obstructor, and through which there is a continuous connection at bottom to earth. It is therefore argued that the patentee did not disclose an invention dependent upon such an absolute insulation at both ends as would prevent him from enjoining the use of a conductor insulated at the end where insulation was necessary, and not insulated at the other end, when it will operate whether insulated or not. The weight of the argument seems to favor the contention of complainant that the insulation intended by the patentee was the insulation at the top—the effective insulation to prevent the oscillations from passing off without operating the transmitting and receiving devices. This contention is further supported by the language of Marconi patent, No. 627,650, relied on by de-

fendant. There, while he says, "The conductor is no longer insulated, but is connected to a capacity, which may be the earth, through the primary of an induction coil," he still refers to these conductors thus connected as "insulated conductors"—that is, functionally insulated—although explaining that they are not insulated as in the former patent. Finally Marconi claims that in the earlier successful uses of his apparatus he used indifferently both conductors insulated from and connected to earth at the lower end.

This question, however, will not be disposed of upon these grounds. Both complainant and defendant now use a construction where the conductors are insulated at the top, but only interrupted or obstructed as to the earth connection at the bottom. The complainant contends that defendant admits that it is immaterial whether the aerial is insulated from the ground at the lower end. Dr. De Forest says that he prefers to employ earth connections, because they permit transmission to greater distances. Both sides are agreed that the function of the earth is not satisfactorily understood. Both agree that such an earth connection is an advantage possibly due to a guiding and strengthening force to conduct the waves to the surface of the earth, so that they may glide farther through the ether. In this state of uncertainty as to the whole subject, it is thought that the patentee should not be deprived of the benefit of his real invention upon any narrow limitation as to the earth connection or interruption at the lower end of the conductor, when it does not appear that even in the case of the spark-gap or tube-filing obstruction the earth did not discharge the same functions as it is now supposed to discharge, and when presumably the question is merely one of degree; the strength being theoretically greater in degree where the earth connection is merely obstructed by a transformer. As Marconi confessedly disclosed in his patent the first successfully operating commercial apparatus, and developed it as thus disclosed till he covered a distance of about 40 miles, and as defendant uses his conductors, in connection with improvements not invented by it, but disclosed by others in the course of the development of the Marconi inventions, consisting, inter alia, in a change in the earth connection or insulation at the lower end, but operating on the same principle as the insulation of the patent, it should not be permitted to escape infringement by claiming that Marconi, in describing his conductors as insulated, was necessarily confined to a form in which the insulation was absolute at both ends.

"Inasmuch as the defendants have not invented any new idea, but have adopted an old contrivance which performs the same result in substantially the same way by a formal and unsubstantial change in means, and by circuits which, while in some sense interdependent, are operatively independent, and which preserve and utilize the vital element, independence of phase, these circuits must be held to be the equivalents of the independent circuits of the patent; the word 'independent' being interpreted to mean operatively independent, so as to embrace the true spirit and essence of the Tesla invention." Westinghouse Electric Mfg. Co. v. New England Granite Co., 110 Fed. 753, 764, 49 C. C. A. 151, 162.

But whatever interpretation of the term "insulated" be adopted, the decision of the question of infringement rests upon the fact that

the Marconi invention in suit is a primary invention, and, as such, is entitled to a broader range of equivalents, so as to prevent the appropriation of the substance of the invention by a mere change in form, accomplishing a mere change in degree.

In McCormick v. Talcott, 20 How. 402, 405, 15 L. Ed. 930, the Supreme Court said:

"If the patentee be the original inventor of the device or machine called the 'divider,' he will have the right to treat as infringers all who make dividers operating on the same principle, and performing the same functions by analogous means or equivalent combinations, even though the infringing machine may be an improvement of the original, and patentable as such."

To the same effect are Railway Company v. Sayles, 97 U. S. 554, 556, 24 L. Ed. 1053, and Morley Machine Company v. Lancaster, 129 U. S. 263, 273, 9 Sup. Ct. 299, 302, 32 L. Ed. 715.

As was said by this court in Dederick v. Siegmund, 51 Fed. 233, 235, 2 C. C. A. 169, 171:

"It is true that when the invention is of a primary character a larger latitude is given to the equivalents which the patent includes than if the invention was a modification of a well-explored art. In the former case, devices which operate upon the same principle and perform the same functions by analogous means are held to be infringements (McCormick v. Talcott, 20 How. 402, 15 L. Ed. 930); and it is also true that when mechanical means are for the first time invented, which enable a law of science or force of nature to be used so as to accomplish a practical and beneficial result, such as the Bell telephone, or when an inventor invents mechanical means for carrying into effect a newly-discovered and useful principle of operation, like the double carbon of Brush, the inventor's properly drawn patent will include a very wide scope of analogous mechanical means which accomplish the same result."

"There are two tests of equivalency: (1) Identity of function; (2) substantial identity of way of performing that function. Primary as well as secondary patents are infringed by no substitutions that do not fully respond to the first of these tests. The second of these tests is somewhat elastic, because it contains the word 'substantial.' That word is allowed to condone more and more important differences in the case of a primary patent than in the case of a secondary one. In the case of a patent narrowed in construction by an extensive state of the preceding art, the word 'substantial' will give but little elasticity to the application of the doctrine. If fewer inventions preceded the one at bar, the word will have somewhat more of carrying power. When the invention at bar is strictly primary, and especially if it is extremely useful, then the word 'substantial' will be made to cover differences alike numerous and important, and even highly creditable to the infringer who invented them." Walker on Patents (4th Ed.) pp. 315, 316, § 362.

In the case at bar the functions of the two devices are identical. The original way of performing the function in Marconi was substantially that of the later way, which is that employed by defendant. The difference of insulation was not a different way of performance, but an enlargement of scope, an increase of the distance of transmission, by a greater use of the property of the earth as a capacity by means of a continuous physical connection. If this conclusion is correct, the equivalency of wires and plates necessarily follows as a corollary thereto. Both were well known and used in the prior art, and it was open to the patentee to adopt whichever was shown by experiment to be capable of producing the better results. That the contention of nonequivalency is also an afterthought of counsel appears from the fact that, although the experts

for complainant, both in chief and rebuttal, testified that wires and plates were equivalents, Dr. De Forest, in explaining the differences between his construction and that of the patent, did not assert that there was any substantial difference between using plates and using wires. That the Marconi conductors should not be limited to the metallic plates at the top of the vertical wires, shown in Figs 10 and 11 of the patent, but should be construed to cover the wires alone, also appears from the following facts:

The claims do not refer in terms to plates, but to conductors. Furthermore the patentee says: "At the receiver it is possible to pick up the oscillations from the earth or water without having the plate, w." In the earlier development of the system the plate on the wire furnished apparently the better, and therefore the preferred, form shown for long-distance transmission. The aerial wire was a part of the prior art, as already shown. Marconi testifies that in his experiments, commencing in 1895, he repeatedly used simple aerial wires as conductors. It is admitted that the aerial wire, without the addition of the plate, is the equivalent of the wire with the plate, and, while such plates are still used, Marconi explains that the chief reason for dispensing with them is the practical difficulty in keeping them in place where they would be exposed to high winds.

The patented coherer is an improved form of that found in the prior art. Most of the claims of the original of the Marconi reissued patent in suit covered the coherer device in a receiver. In his reissued patent he says as follows:

"I am aware that the sensitiveness of various apparatus, including tubes containing filings, to more or less distant electrical disturbances, has been observed in a general way, and that it has also been proposed to disturb the conductivity of such filings by various instrumentalities for shaking the tubes containing the same. I am also aware that the use of tubes containing metallic powders of several separate kinds has been described or suggested in connection with certain experiments relating to so-called coherers, but I am not aware that the utility of a mixture of metallic powders has ever previous to my invention been ascertained and utilized for the purpose of obtaining the required degree of sensitiveness in such an instrument."

This coherer is specifically described as comprising a dry powder, which, after it has operated to carry the impulses of the Hertzian waves to the receiver, must be shaken by a trembler back into its nonconductive condition. Defendant's liquid circuit closer or detector is covered by its patents. Its construction and operation have been already explained. It could not be used in the Marconi system. It is a newly discovered combination, in a newly evolved class of detectors. Complainant's tube transmits sounds by increase of resistance; defendant's, by decrease of resistance. But the effect of the oscillations upon various materials in respectively increasing and decreasing resistance had been pointed out by Branley in 1891, where he says:

"Substances in Which Diminution of Resistance has been Observed.

"The substances in which the phenomenon of the sudden increase of conductivity is most easily observed are filings of iron, aluminum, copper, brass, antimony, tellurium, cadmium, zinc, bismuth, etc.

"Increase of Resistance.

"An increase of resistance was observed in these investigations less often than a diminution. Nevertheless a number of frequently repeated experiments enable me to say that increase of resistance is not exceptional, and that the conditions under which it takes place are well defined. Short columns of antimony or aluminum powder, when subjected to a pressure of about 1 kilogramme per sq. om (142 lb. per square inch), and offering but a low resistance, exhibited an increase of resistance under the influence of a powerful electrification. Peroxide of lead, a fairly good conductor, always exhibited an increase. So, also, did some kinds of platinized glass, while others showed alternate effects."

And as already shown, Marconi states that the form of tube described by him may be replaced by other forms of imperfect electrical contacts.

The file wrapper of defendant's patent, No. 716,000, shows that the original broad claims were rejected by the Patent Office. There the examiner said, in view of prior publications, as follows: "It is held that it would not amount to invention to place the anti-coherer substances above described in a similar paste as in applicants' construction," and he rejected a large number of claims on said prior publication and on Marconi's and other patents. The applicants thereupon argued that it involved invention to provide a device which "is not subject to limitations in speed due to the mechanical lag necessarily present in those devices which depend upon mechanical agitation to restore them to sensitive condition after the passage of each electrical impulse or energy wave. It is evidence of invention of the highest order of merit to produce a device which is automatically restored, so to speak, to sensitive condition, and wherein the speed of operation is coextensive with the ability to read the signals. This is not the case with the coherers of the references." Thereafter the old claims were generally canceled, and new claims introduced, which were materially modified, and which chiefly cover an improved form of coherer or detector device, which, by reason of its liquid or semi-liquid characteristics, operated automatically without the use of a trembler or tapper. This improved device therefore does not infringe those claims which are limited to a dry powder, but it does infringe the claims covering an imperfect electrical contact, because it produces the same result—the transmission of the oscillations by a variation of resistance—and by means which operate in substantially the same way, namely, by changing the amount of resistance in the coherer or detector device. Defendant's detector is not the equivalent of the "tube containing metallic powder" of claims 8 and 10. But it is the equivalent of the imperfect electrical contact of claims 1, 3, and 5, because it utilizes means identical in function and substantially identical in method with those first employed by Marconi in his primary invention to produce the same results. Claim 24 covers, inter alia, "a conductor tuned to respond to such oscillations," and "means controlled by the received oscillations for restoring the resistance medium to its normal conditions," etc. There is no evidence that defendant uses any tuned conductor, and it is not clear to what this clause refers, unless it be to the specifically described

plates tuned with each other in the air.  The means for restoring the resistance medium refers to the automatic hammer or trembler described as used to shake the powder after the oscillation of the current has passed through it.  The defendant uses neither of these devices, and therefore does not infringe the 24th claim.

These conclusions dispense with the necessity of considering the effect of the changes introduced into the reissued patent in suit, except in so far as they relate to claim 1.

The original patent contained 56 claims.  It is not clear that any rights have intervened to prevent said reissue, or that it has been improperly broadened to cover inventions not embraced in the original patent.  The claims in suit, except claim 1, are substantially the same as were found in the original patent.  But claim 1 is a new, broad claim, which, in terms, covers every form of imperfect contact in every possible kind of system for producing signals by means of Hertz oscillations.  In view of the limitations imposed upon the Marconi coherer by the disclosures of Branley, Popoff, and Lodge, such a generic claim, much broader than those of the original patent for which it seems to have been substituted, should not be permitted when the effect would be to enlarge the scope of the original invention.  In the original patent, as already shown, Marconi limited most of his claims to a combination in a receiver for electrical oscillations of his coherer, consisting of a tube and powder, and means for shaking the powder.  But inasmuch as this had been disclosed by prior publications, he applied for the reissue, and now, by claim 1, has attempted to cover, as shown above, not merely the coherer of his former claims, or any such coherer in a receiver, or a coherer with means for shaking the powder therein, but every form of imperfect contact device previously disclosed by others, or which might be thereafter discovered, whenever combined with any electrical signal apparatus using Hertz oscillations.  This claim, if allowed, would apparently cover the prior devices of Lodge and Popoff, the latter of which is claimed to have necessitated the disclaimer and reissue.

A decree may be entered dismissing the bill as to claims 1, 8, 10, and 24, and for an injunction and an accounting as to claims 3 and 5; complainant to recover one-half of its costs.

NOTE.—On the settlement of the decree it was ordered "that no costs be recovered by either defendant or complainant."