MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. AMERICAN DE FOREST WIRELESS TELEGRAPH CO. et al.

(Circuit Court, S. D. New York. April 22, 1907.)

PATENTS—INFRINGEMENT—WIRELESS TELEGRAPHIC APPARATUS.

Infringement of claim 3 of the Marconi reissued patent, No. 11,913 (original No. 586,193), for improvements in transmitting electrical impulses and signals and in apparatus therefor, *held*, in such doubt on the showing made as not to warrant the granting of a preliminary injunction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 478, 479.]

In Equity. On motion for preliminary injunction.

Betts, Sheffield & Betts, for complainant.

Philip Farnsworth and Francis X. Butler, for defendants.

TOWNSEND, Circuit Judge. On motion for preliminary injunction. The original opinion in the suit by this complainant against the De Forest Wireless Telegraph Company, the predecessor of this defendant, is reported in 138 Fed. 657. Judge Wheeler's opinion in National Electric Signaling Company against the original De Forest Company (C. C.) is reported in 145. Fed. 354.

In the original suit brought by this complainant against the De Forest Wireless Telegraph Company on claims 1, 3, 5, 8, 10, and 24 of complainant's reissued Marconi patent, No. 11,913, granted to Marconi in 1901, this court held that the first claim was invalid, that the other claims were valid, and that defendants had infringed the third and fifth claims of said patent, but had not infringed claims 8, 10, and 24 thereof, and dismissed the bill as to claims 1, 8, 10, and 24. In this decision both parties acquiesced. In the present case the motion for a preliminary injunction is founded only on claim 3 of said patent. The principal defendant in this case, the American De Forest Wireless Telegraph Company, is the successor of the former defendant, and actually defended the original company in the former suit against it.

In the present case the defendants are using a modified apparatus, differing in many respects from the one against which the former suit was directed. The contention of complainant is that the alterations made by defendants have not materially changed the system so far as concerns the infringement of claim 3.

Said claim is as follows:

"The combination, in an apparatus for communicating electrical signals, of a spark-producer at the transmitting-station, an earth connection to one end of the spark-producer, and an insulated conductor connected to the other end, an imperfect electrical contact at the receiving-station, an earth connection to one end of the contact, an insulated conductor connected to the other end, and a circuit through the contact, substantially as and for the purpose described."

Defendants deny infringement, on the ground, inter alia, that the new system is totally different from that covered by said claim in construction, operation, and result. These alleged differences, so far as is material to the disposition of the questions herein, are as follows: (1) In defendants' new system "the receiving conductor is not insulated, but is electrically connected at its upper end to an earth plate by a wire or cable." (2) The defendants do not use "an imperfect electrical contact at the receiving station" to detect the electrical oscillations. (3) The defendants' earth connection is not connected to one end of the spark-producer, nor is the insulated conductor connected to the other end of the spark-producer. (4) The defendants' detector is not connected at one end to an insulated conductor and at the other end to an earth connection. Whether the defendants use an "imperfect electrical contact" at the receiving station apparently depends upon the meaning to be attached to said term, and upon the causes which set the detector in motion. Upon these questions the opposing affidavits are directly in conflict.

Thus, defendants' expert, Prof. Ives, says as follows:

"The meaning of the term is very clear. To fulfill the electrical condition implied, first, we must have two separate pieces of the metal brought into contact; and, second, this contact must be a loose one—that is, the pressure between them must be so slight that they can be easily jarred apart. * * * The position taken by Profs. Cross and Fleming that the electrolytic detector used by the defendants operates by an increase of resistance due to heating of the electrolyte is, in my opinion, entirely untenable in view of recent investigations."

Complainant's expert, Prof. Cross, says:

"Hence, in my opinion, even if there were not present an actual imperfect contact in defendants' responder, I fail to see that there could be any substantial change brought about in the action of the device by a substitution which merely involved varying an electromotive force in the circuit instead of varying a resistance. * * * I do not think that all the arguments advanced in favor of the hypothesis held by defendants' experts are beyond criticism, and they themselves speak with different degrees of certainty. The burden of the evidence seems in favor of their hypothesis. * * * And that little is known, even as yet, regarding the ultimate facts in the case is shown by the following quotation from the paper referred to, that of Gundry, published in the Philosophical Magazine for March, 1906:

" 'On the theoretical side there is, so far as I know, no satisfactory explanation. The idea of the depolarization set forth by Rothmund and Lessing, by which one phase of the alternating current passes easily from electrolyte to electrode owing to oxidation, the other with difficulty, based on a comparison with the aluminum rectifier, appears to help but little to a clear understanding of the question. A satisfactory explanation must account for the very marked dependence on the degree of polarization of the electrode. We know, however, very little indeed of the conditions which prevail in an oxygen, or hydrogen-charged platinum electrode, and the hope of obtaining a satisfactory explanation of the above phenomenon seems remote until this gap in our knowledge is filled.' "

He further says:

"The way in which the variation of resistance at the imperfect contact takes place in the different responders referred to, as explained in the former case and by defendants' expert in the present case, is not precisely the same."

In addition to these admissions, it further appears from Prof. Cross' affidavit that he bases his assertion of infringement upon his opinion as to the scope of the patent in suit. He says that in his opinion Marconi does not limit himself to any particular kind of contact.

In the original opinion in this case this court held that defendants' improved form of detector device, which by reason of its liquid or semiliquid characteristics operated automatically without the use of a trembler, did not infringe those claims which were limited to a dry powder, but it "does infringe the claims covering an imperfect electrical contact because it produces the same result, the transmission of the oscillations by a variation of resistance, and by means which operate in substantially the same way, namely, by changing the amount of resistance in the coherer or detector device."

In view of the admissions quoted above, and of the grounds on which Prof. Cross bases his conclusions, I am not satisfied that the new detector infringes the claim in suit. Furthermore, Prof. Ives, one of the experts for defendants, in support of his claim that defendants' device is a perfect electrical contact, quotes from the opinion of Judge Wheeler in National Electric Signaling Co. v. De Forest Wireless Telegraph Co., supra, as follows:

"An immersion of platinum of a diameter of .00004 of an inch to the depth of .00002 of an inch is mentioned in the specification, 'for example,' but there is added: 'The immersion of the terminals should be such as to insure what is known in the art as a perfect contact between the terminals and liquid.' This perfect contact appears to be the operative and material thing, and the defendants' device in question appears to, and must to be of any use, have that."

In that case the defendant De Forest Company, which used the detector herein complained of, was enjoined against its use, on the ground that it was a perfect electrical contact, while in this case an injunction is sought, on the ground that said detector is an imperfect electrical contact.

Great stress is laid by defendants on the contention that its receiving conductor is not insulated. I am not certain whether I fully comprehend the exhaustive and conflicting theories upon this point. The complainant, in effect, claims that, while the defendants' receiving wires are physically connected to earth, they are electrically and effectively insulated, on the ground that, when the waves impinge upon the receiving wires, they all surge upward thereon with equal intensity, and meeting at the top, where there is air insulation, they are arrested, and by their opposing and resultant neutralizing action upon each other they are thus practically insulated at the upper end.

Defendants claim as follows:

"We remember that the conductor of the receiving system of the patent in suit was essentially insulated at its upper end in order to be operative at all, and as so constituted, as an open circuit, was a good reradiator and consequently a poor conservator of received energy, and it provided no shunt path to earth for static discharges which were therefore required to pass through the detector-circuit, and it was essentially a nonresonant conductor which was not naturally and could not be made artificially in proper resonance with passing waves. It is clear that defendants' receiving apparatus, comprising an essentially resonant closed loop circuit, and connected to earth at top and bottom to sharpen the resonance and provide static discharge paths to earth, constitutes a fundamentally and radically different system from that of the patent in suit."

The theory of defendants' experts is that its system of wires constituting its closed loop is conservative of energy, and, being provided on its opposite sides or arms with inductance helixes of varying degrees of strength or resistance, when waves impinge thereon, the surgings of the oscillations, by means of an adjustance of the left hand helix to a low impedance, rush past the central or earth connection at the bottom and against the condenser, and are reflected back again until the entire received energy has been expended to effect the operation of the detector circuit.

The following quotation from the brief of defendants' counsel further illustrates the opposed contentions of the parties: Referring to the statement in the affidavit of one of complainant's experts, as to the effect of destroying the insulation of complainant's receiving conductor, he says as follows:

"In stating that the elimination of the insulated character of the Marconi aerial will result in rendering is inoperative and nonresponsive to the incoming waves, he but admits the accuracy of the testimony of defendants' deposing scientists that a simple connection to earth from the top of the receiving aerial of the patent in suit, thus eliminating the insulation at the top, destroys the operativeness of the Marconi system. This has the effect of emphasizing the fact that defendants' loop system is a substantially different system, in that it has two conductors electrically connected together (and neither are insulated) at the top, each conductor leading to different parts of the system, and being operative, since there is no insulation at the top to stop the oscillations and prevent their going down first one side and then up the other alternately, and being operative because (notwithstanding the uninsulated connection from

the top, which would make the Marconi system inoperative) of the existence of other apparatus connected in the loop. Cross' statement that, in defendants' loop system, the insulation must yet exist functionally at the top, because the system is operative, is met by the fact that in the loop the oscillations swing entirely around the loop, first in one direction and then in another. Each side of the loop takes equal part in this operation, and it is solely by reason of the essential lack of insulation at both top and bottom in the loop, the top and bottom of one side being electrically connected to the top and bottom of the other side, that the system is made operative. It is by reason of these connections, lacking insulation, that the oscillations can pass from one side to the other, both at top and bottom, all around the loop, and then pass from the second side to the first, both at top and bottom, thus swinging entirely around the loop, with all the consequent advantages accompanying such a revolutionary mode of operation. The function of the top insulation was to prevent such a flow of oscillations shunting the receiving devices, and was to compel them to be driven back downwardly through those devices; because, if this were not done, all the energy would be shunted to earth, without operating the receiving devices. In defendants' loop the function of the top connection is to permit the passage of those very oscillations which it was the function of the Marconi top insulation to prevent. The fact, as Cross admits, that the elimination of the top insulation in the Marconi receiving system would cause inoperativeness, is conclusive of the fact that defendants have done something more than merely to eliminate that insulation."

The complainant claims that defendants by their modified construction have appropriated the invention of the claim in suit, and have merely added supplementary or improvement features with alleged improved functional characteristics. The defendants claim that this construction involves a radically new construction operating on a new principle, and in a manner so totally different that it could not be used in the apparatus of the patent in suit.

The sole decisive test of this question is to be found in a complete and accurate understanding of the operation of the two devices. But, upon this point, as shown above, the affidavits of the experts are conflicting, and I cannot determine to my satisfaction the facts necessary to enable me to dispose of the question of infringement. These instances have been selected merely as illustrative of the counter allegations in a voluminous mass of affidavits relating to a subject, as to which it is admitted that very little is known of the principle or actual operation of the Hertzian waves, of the resultant oscillations, or of the character of the contact in the materials composing the detectors or receivers. In these circumstances, it would be an unwarrantable exercise of judicial discretion to grant the extraordinary remedy of a preliminary injunction. The forcible statements of experts and arguments of counsel have raised such a substantial doubt in my mind upon the question of infringement that I think its determination should be postponed until the accuracy of the statements or their indefiniteness as mere theories can be thoroughly tested upon examination and cross-examination on final hearing.

The motion for a preliminary injunction is denied.